[No. S010199. May 31, 1990.]

RICHARD E. KWASNIK, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

**COUNSEL**

Richard E. Kwasnik, in pro. per., for Petitioner.

Diane C. Yu, Truitt A. Richey, Jr., and Richard J. Zanassi for Respondent.

OPINION

**THE COURT.**—Petitioner Richard E. Kwasnik seeks review of the refusal of the State Bar to certify him to this court for admission to the bar on the ground that he lacks the requisite good moral character. (Bus. & Prof. Code, § 6066; Cal. Rules of Court, rule 952(c); Rules Regulating Admission to Practice Law, rule I, § 11.)[1] For the reasons set forth below, we conclude petitioner should be admitted to the bar.

FACTS

Petitioner graduated from Brooklyn Law School in June 1966. He was admitted to the practice of law in New York in 1967.

In November 1970 petitioner was involved in an automobile accident that resulted in the death of Steven Smilanich, a husband and father of three children. Although a grand jury investigated the accident, no criminal charges were filed. Petitioner pleaded guilty to "driving while impaired," a traffic infraction, and was fined $50.

The decedent's widow (hereafter Smilanich) and decedent's three minor children filed a wrongful death action against petitioner in a New York court, which resulted in a judgment against him in the amount of $232,234.16 in July 1974. Petitioner's automobile insurance carrier paid the policy limit of $10,000 to Smilanich. In 1975 Smilanich filed attachment proceedings against petitioner to enforce the judgment by garnishing his wages; he previously had made no payments on the judgment. Once he received a notice of levy, petitioner began making payments of approximately $42 every two weeks. Between 1975 and January 1980, petitioner paid $4,685. He has paid nothing since January 1980.

In November 1980, after Smilanich's attorney rejected a settlement offer of $15,000, petitioner filed a petition for bankruptcy in the United States Bankruptcy Court for the Southern District of Florida. (See *Florida Bd. of Bar Examiners Re: Kwasnik* (Fla. 1987) 508 So.2d 338, 339 (hereafter *Kwasnik*).) The only debt scheduled for discharge in the bankruptcy petition was the Smilanich judgment; petitioner listed none of his other then-existing debts. The Smilanich judgment was discharged by the bankruptcy court in March 1981.

---

[1] Unless otherwise noted, all references to rules are to the Rules Regulating Admission to Practice Law in California.

A. *Florida Bar Proceedings*

In response to petitioner's 1979 application to the Florida State Bar, the Florida Bar Examiners (Florida Bar) found that he failed to meet the standards of conduct and fitness and concluded that he should be denied admission. In a 1980 hearing regarding petitioner's admission to the Florida State Bar, he was charged with three instances of wrongful conduct that he does not dispute. First, in a deposition taken during the wrongful death suit, petitioner testified falsely that he had no joint interest in any checking account or other item of personal property. In fact, he was a signatory on a joint account with his wife at the time. Second, in his Florida State Bar application petitioner stated that following the wrongful death judgment $10,000 was paid to Smilanich, "which represented all the assets available," and that he paid approximately $1,200 per year toward the judgment. He concluded, "I fully intend to continue all payments in the future." Actually, petitioner paid as much as $1,200 only in 1979, and completely stopped payment in January 1980, five months after filing the application. In addition, the record suggests that other assets were available to petitioner. Third, after petitioner moved to Florida in February 1980 he earned $27,000 per year, yet refused to make any further payments under the judgment after January 1980. The record suggests that petitioner discontinued the payments because of a Florida statute that exempts salaries from garnishment. Petitioner was denied admission to the Florida Bar in 1980. In February 1981 the Florida Supreme Court denied his petition for review.

In March 1983, petitioner applied for reevaluation. Because he did not pay the required deposit until April 1986, it was not until January 1987 that the Florida Bar again found that petitioner failed to meet the moral character requirements. In June 1987, however, the Florida Supreme Court rejected the Florida Bar's recommendation, holding that petitioner met the moral character requirements and ordering that he be admitted on passing the Florida Bar Examination. The court noted that he had already been denied admission because of the aforementioned three instances of misconduct. (*Kwasnik, supra,* 508 So.2d at p. 339.) Accordingly, it focused on whether the Florida Bar could deny petitioner admission for failing to make any effort after bankruptcy to provide assistance to the Smilanich family, although he had no legal obligation to do so. (*Ibid.*) It held that because the bankruptcy laws were designed to provide a fresh start for those who are overburdened with debt, it could not allow any continuing moral obligation to the Smilanich family to be considered in his petition for admission to the Florida State Bar. (*Ibid.*) The court further noted that petitioner had performed as a "competent" lawyer working at modest pay for the New York Legal Aid Society and otherwise had led an "exemplary life" since his first application in Florida. Accordingly, the court held he had demonstrated

sufficient rehabilitation to qualify for admission. (*Id.* at p. 340.) In May 1988 petitioner was admitted to the practice of law in Florida.

B. *California Bar Proceedings*

In July 1987 petitioner passed the Attorney's Examination of the California Bar Examination. His certification to practice was delayed, however, pending a moral character investigation. In June 1988 a formal hearing was held before a three-member hearing panel of the State Bar Court. Prior to the hearing petitioner entered a stipulation of facts with the State Bar. The hearing panel found that he had sustained his burden of proof that he is of good moral character and recommended that he be admitted to the California Bar.

Pursuant to a request for reconsideration, the hearing panel again recommended that he be admitted to the practice of law and issued a finding of facts that closely tracked the stipulation between the parties. First, it concluded that petitioner's description on his California Bar application of the disposition of the Smilanich suit as a "verdict for defendant" was not an intentional misstatement made to deceive. Second, it found that he accepted full responsibility for the three acts considered by the Florida Bar. Third, it concluded that the discharge of the Smilanich judgment in bankruptcy discharged both the legal and moral obligations of petitioner. Finally, it noted that except for the Smilanich matter petitioner's record is unblemished; that his conduct, as evidenced by the testimonial letters he submitted, established he is of a good moral character; and that he has an excellent reputation in the community for honesty, reliability, fairness and integrity. The hearing panel concluded that if he were admitted to the practice of law petitioner would be able to meet the professional and fiduciary duties of his practice.

The Review Department of the State Bar Court (hereafter the review department), however, made its own findings and disagreed with the hearing panel's conclusions. First, the review department detailed certain circumstances attendant on petitioner's bankruptcy: (1) between 1975 and 1979, when Kwasnik made payments only pursuant to garnishment proceedings, he earned an annual salary of between $15,000 and $32,000, totaling at least $100,000, while living rent-free at his mother's home and putting his wife through five years of college; and (2) petitioner misled Smilanich's attorney in 1980 by expressing an intention to take a one-year leave of absence when he had already accepted a new job in Florida.

Second, the review department cited a report issued by the Florida Bar after a formal rehabilitation hearing held in November 1986 on petitioner's

application for reevaluation. The Florida Bar found that petitioner had taken no steps to fulfill his moral obligation to Smilanich since 1980. It noted that he had neither contacted the survivors nor made any further payment to them, despite the fact that he and his wife earned a combined income of $90,000 and owned $225,000 of equity in a home valued at $250,000. In addition, the review department noted that the Florida Bar found petitioner to be less than candid at the rehabilitation hearing, especially when asked why his New York home was in his wife's name.

Finally, the review department concluded that petitioner had demonstrated a lack of good moral character by failing to accept "any responsibility whatsoever for the Smilanich family which was victimized by his drunken driving." It found he ignored the rights of the Smilanich family under the wrongful death judgment until after garnishment proceedings were instituted, and then paid only the minimum in order to avoid the wage garnishment. Accordingly, in March 1989 the review department, by a vote of 11 to 4, found that petitioner did not possess the requisite good moral character and recommended that he not be admitted to the practice of law in California. The four members voting for petitioner's admission noted that the finding of lack of good moral character was based entirely on his failure to honor a moral obligation to pay a wrongful death judgment discharged in bankruptcy. They concluded petitioner should be admitted because he had successfully established his good moral character by his practice of law in sister jurisdictions and the attestations of judges and lawyers.

## DISCUSSION

This court may admit to the practice of law any applicant whose qualifications have been certified to it by the Committee of Bar Examiners (hereafter the Committee). (Bus. & Prof. Code, § 6064.) To qualify, an applicant must, among other things, be of "good moral character." (*Id.*, § 6060, subd. (b).)

■ "Good moral character" has traditionally been defined in California as the " 'absence of proven conduct or acts which have been historically considered as manifestations of "moral turpitude." ' " (*Hallinan* v. *Committee of Bar Examiners* (1966) 65 Cal.2d 447, 452 [55 Cal.Rptr. 228, 421 P.2d 76] (hereafter *Hallinan*).) Good moral character also is defined statutorily to include "qualities of honesty, fairness, candor, trustworthiness, observance of fiduciary responsibility, [observance] of the laws of the state and the nation and respect for the rights of others and for the judicial process." (Rule X, § 101(a); *Pacheco* v. *State Bar* (1987) 43 Cal.3d 1041, 1046 [239 Cal.Rptr. 897, 741 P.2d 1138] (hereafter *Pacheco*).)

Because the commission of an act constituting "moral turpitude" is a statutory ground for disbarment (Bus. & Prof. Code, § 6106) and is perhaps the most frequent subject of inquiry in disciplinary proceedings, "insofar as the scope of inquiry is concerned, the distinction between admission and disciplinary proceedings is today more apparent than real." (*Hallinan, supra,* 65 Cal.2d at p. 452.) The common issue is whether the applicant for admission or the attorney sought to be disciplined "is a fit and proper person to be permitted to practice law, and that usually turns upon whether he has committed or is likely to continue to commit acts of moral turpitude." (*Id.* at p. 453; cf. *Seide* v. *Committee of Bar Examiners* (1989) 49 Cal.3d 933, 938 [264 Cal.Rptr. 361, 782 P.2d 602].)

██ The burden is on the applicant to prove good moral character. (*Hallinan, supra,* 65 Cal.2d at p. 451.) If he is successful, the Committee must rebut that showing with evidence of bad character. (*Hightower* v. *State Bar* (1983) 34 Cal.3d 150, 155 [193 Cal.Rptr. 153, 666 P.2d 10].) Any applicant who is denied certification may seek review of the Committee's action in this court. (Bus. & Prof. Code, § 6066; Cal. Rules of Court, rule 952(c); Rules Regulating Admission to Practice Law, rule I, § 11; *Pacheco, supra,* 43 Cal.3d at p. 1047.) In that review we give great weight to the Committee's findings, but they are not conclusive. We examine the evidence and make our own determination as to its sufficiency (*Hightower, supra,* 34 Cal.3d at pp. 155-156), resolving reasonable doubt in favor of the applicant. (*Hallinan, supra,* 65 Cal.2d at pp. 450-451.)

██ Petitioner contends he has established his rehabilitation and good moral character. We agree. Petitioner introduced fifteen letters attesting to his character: seven from judges before whom he had appeared, seven from attorneys with whom he had practiced, and one from a pastor with whom he had worked on an interfaith council. The letters praise petitioner's personal and professional integrity and his reputation both as a competent trial attorney and as a member of the community.

██ Traditionally we have accorded significant weight to testimonials submitted by attorneys and judges regarding an applicant's moral fitness, on the assumption that such persons possess a keen sense of responsibility for the integrity of the legal profession. (*Pacheco, supra,* 43 Cal.3d at p. 1053.) This is especially true when, as here, the references are aware of the circumstances that prompted the inquiry into the applicant's moral character. (*Ibid.*; cf. Rules Proc. of State Bar, div. V, Stds. for Atty. Sanctions for Prof. Misconduct, std. 1.2(e)(vi).) ██ Petitioner testified that eight of the letters he submitted with his California application were written on his behalf in 1983 for his second application to the Florida Bar and that he was required by the Florida State Bar to inform the references of his bankruptcy

and misconduct before the letters would be accepted. In fact, petitioner testified that all but three of the references knew of the allegations in this case when they wrote their letters.

In addition, the hearing panel and the review department both recognized that except for the events surrounding the wrongful death action, petitioner has an "unblemished record"; this is true not only of certain litigation in which petitioner was a party, in which his conduct did "not reflect badly on his moral character," but also of a 20-year period as a practicing member of the New York Bar, during which time he was never the subject of a disciplinary proceeding. Whether or not all petitioner's activities for which his superiors at the New York Legal Aid Society lauded him were simply part of his responsibilities, e.g., training and advising younger attorneys, there is extensive evidence that he acted diligently in that capacity. In addition, petitioner served competently in a fiduciary role as trustee of a $400,000 trust established by the City of New York for petitioner's parapalegic cousin; the Associate General Counsel of New York City who was in charge of that trust also submitted a letter on petitioner's behalf. Finally, as noted above, the Florida Supreme Court determined on the same evidence that petitioner was of good moral character and admitted him to the Florida Bar.

Business and Professions Code section 6106 states that an act of moral turpitude, dishonesty, or corruption constitutes a cause for disbarment or suspension of an attorney, regardless of whether the act is committed in his capacity as an attorney. Because the misconduct in this case is not in any way related to petitioner's practice of law, however, we should accord it less weight than we would professional misconduct in evaluating his moral fitness for admission to the bar. (See *In re Kreamer* (1975) 14 Cal.3d 524, 531 [121 Cal.Rptr. 600, 535 P.2d 728].)

It follows that petitioner presented a prima facie case that he is presently of good moral character. (See, e.g., *Greene* v. *Committee of Bar Examiners* (1971) 4 Cal.3d 189, 192 [93 Cal.Rptr. 24, 480 P.2d 976] [prima facie case of applicant's moral character established by evidence of his admission to practice in two other states and by a number of favorable letters of recommendation].)

Petitioner also contends the State Bar improperly denied him certification because he has made no effort to fulfill an asserted moral obligation to the Smilanich family, even though his legal obligation was discharged by his voluntary bankruptcy. ▉ Petitioner is correct in reasoning that the State Bar would violate the Bankruptcy Act if its sole reason for denying certification were such a moral obligation to the Smilanich family. (See 11

U.S.C. § 525(a) (hereafter section 525(a)) [governmental unit may not deny a license to a person "solely because" he has not paid a debt that was discharged under the Bankruptcy Act]; *Parker* v. *Contractors State License Board* (1986) 187 Cal.App.3d 205, 208-209 [231 Cal.Rptr. 577] [primary purpose of section 525(a) is to prevent the government from conditioning a grant of privilege on the bankrupt's affirmation of certain debts].) In addition, it would be a violation of the supremacy clause of the federal Constitution (U.S. Const., art. VI, cl. 2) to act so as to interfere with or frustrate the purposes of Congress in enacting the Bankruptcy Act (*Perez* v. *Campbell* (1971) 402 U.S. 637, 648 [29 L.Ed.2d 233, 241, 91 S.Ct. 1704]; *Grimes* v. *Hoschler* (1974) 12 Cal.3d 305, 310 [115 Cal.Rptr. 625, 525 P.2d 65]),[2] i.e., to give debtors a "new opportunity" and a "clear field for future effort" by eliminating preexisting debts (*Perez, supra,* 402 U.S. at p. 649 [29 L.Ed.2d at p. 242]).

 The State Bar maintains the review department did not rely solely on petitioner's discharge of the judgment in bankruptcy to deny petitioner admission to the bar, but also considered the circumstances surrounding the bankruptcy proceedings. As shown below, however, the evidence unrelated to the discharge on which the State Bar relies does not reflect on petitioner's current fitness to practice law in California. By refusing to certify petitioner on the evidence presented, therefore, the review department not only frustrates congressional intent but it violates section 525(a). In so concluding, we in no way condone any intent to evade a wrongful death judgment imposed by a court of equal jurisdiction. Rather, based on the evidence presented of his fitness to practice law and the dictates of the Bankruptcy Act, we only hold that petitioner must be certified for admission to the California Bar.

The evidentiary significance of an applicant's misconduct is greatly diminished by the passage of time and by the absence of similar, more recent misconduct. (*Pacheco, supra,* 43 Cal.3d at p. 1051; see also *Martin B.* v. *Committee of Bar Examiners* (1983) 33 Cal.3d 717, 726 [190 Cal.Rptr. 610, 661 P.2d 160] [passage of nine years with an exemplary record is sufficient to show rehabilitation and to justify admission of an applicant charged with two rapes while serving in the Marine Corps]; *Hall* v. *Committee of Bar*

---

[2] Section 525(a) "is additional debtor protection. It codifies the result of Perez . . . which held that a state would frustrate the Congressional policy of a fresh start for a debtor if it were permitted to refuse to renew a drivers license because a tort judgment resulting from an automobile accident had been unpaid as a result of a discharge in bankruptcy . . . . It does not prohibit consideration of other factors, such as future financial responsibility . . . if applied nondiscriminatorily . . . . The effect of the section, and of further interpretations of the Perez rule, is to strengthen the anti-reaffirmation policy found in section 524(b). Discrimination based solely on nonpayment could encourage reaffirmations, contrary to the expressed policy." (Notes of Com. on the Judiciary, Sen. Rep. No. 95-989, 2d Sess., p. 81 (1978).)

*Examiners* (1979) 25 Cal.3d 730, 742 [159 Cal.Rptr. 848, 602 P.2d 768] ["We are also impressed by the fact that six years have elapsed since the last of the four incidents took place, during which time no complaints of any kind have been lodged" against applicant]; *Hallinan, supra,* 65 Cal.2d 447, 464 [applicant involved in nine fistfights, six of which were "inexcusable" but occurred at least six years prior to application for admission, held not to bar admission].)

The automobile accident at issue here occurred 20 years ago, in 1970; the wrongful death judgment was entered in 1974; and the judgment was discharged by the bankruptcy court in 1981. All other instances of misconduct listed by the review department took place before the 1980 Florida State Bar proceedings, except for petitioner's purported lack of candor at the November 1986 rehabilitation hearing. In this regard, the record demonstrates petitioner's rehabilitation: there is no suggestion by either the hearing panel or the review department, nor do we find any indication on independent review, that petitioner was anything but candid in the California proceedings. In addition, except for the limited nature of this misconduct, petitioner's record is unblemished. He has never been the subject of a disciplinary proceeding in over 20 years as a practicing attorney. Indeed, on the same evidence the Florida Supreme Court held that petitioner should be admitted to the practice of law in Florida. Petitioner's continued failure to satisfy his "moral obligation" is the *only* allegation of recent misconduct.

Moreover, petitioner addressed many of the review department's concerns at the June 1988 hearing. First, he explained why he listed only the Smilanich judgment in his bankruptcy schedule: "The interest was increasing greater than any payments I made. I had no money at that time. I lost a job at that time [because of the refusal of the Florida Bar to admit him]. I had to relocate at that time. I had an infant child and a five-year-old child . . . . I felt at that time . . . there would not be any attempt on the part of the plaintiff to ever settle this matter with me." Second, he did not attempt to justify any of his misstatements. Addressing his denial of a joint account with his wife, he said, "There was never any money in the account. I was never hiding any assets. I just was not dealing rationally with [the financial scrutiny] any longer . . . . I was wrong." In addition, while not explaining his lack of candor in responding to questions by the Florida Bar about the title to his house, he did state that the house had been bought with funds inherited by his wife. Addressing his rehabilitation, petitioner relied on his activities while at the New York Legal Aid Society—both teaching younger attorneys and representing career criminals when a "higher prevailing wage" was available for experienced attorneys. In addition, the record indicates petitioner now carries over $1 million in automobile insurance, demonstrating increased financial responsibility.

That the review department considered the circumstances surrounding the bankruptcy proceedings as well as petitioner's discharge of the judgment, therefore, does not mean it can refuse to certify him for admission without violating section 525(a). The circumstances surrounding the 1981 bankruptcy proceedings are so remote in time that they cannot reasonably be said to reflect on petitioner's moral fitness to practice law. The evidence relied on by the State Bar rebuts neither petitioner's prima facie case of good moral character nor his showing of rehabilitation. As a result, the State Bar cannot refuse to certify petitioner for admission without relying solely on the discharged judgment and, thus, violating section 525(a).

Our recent decisions in *Brookman* v. *State Bar* (1988) 46 Cal.3d 1004 [251 Cal.Rptr. 495, 760 P.2d 1023] (hereafter *Brookman*), and *Hippard* v. *State Bar* (1989) 49 Cal.3d 1084 [264 Cal.Rptr. 684, 782 P.2d 1140] (hereafter *Hippard*), are distinguishable. In those cases we were confronted by the discharge in bankruptcy of obligations incurred as the result of attorney misconduct. We held section 525(a) did not forbid consideration of restitution efforts, reasoning that restitution was not imposed "solely because" the attorney failed to pay a debt discharged in bankruptcy but to protect the public from specified professional misconduct and to rehabilitate the attorney. (*Brookman, supra,* 46 Cal.3d at p. 1008; *Hippard, supra,* 49 Cal.3d at p. 1093.) Such a claim cannot be made in this case.

In *Brookman*, an attorney who improperly borrowed $50,000 from a client discharged the debt in bankruptcy. After the client received restitution from the State Bar Client Security Fund, the State Bar ordered the attorney to reimburse the fund. We held that nothing in the Bankruptcy Act or in the cases interpreting that act prevents imposition of restitution as a condition of probation in an attorney disciplinary matter, even if the underlying subject of the restitution has previously been discharged in bankruptcy, and thus cannot be collected as a debt as such. (*Brookman, supra,* 46 Cal.3d at p. 1009.) "[T]he purpose of attorney discipline is *not* to penalize petitioner merely for having obtained a discharge of his debt in bankruptcy. Instead, it is to protect the public from *specified professional misconduct* . . . , and at the same time to rehabilitate the errant attorney." (*Id.* at p. 1008.)

In so holding, we relied on the United States Supreme Court decision in *Kelly* v. *Robinson* (1986) 479 U.S. 36 [93 L.Ed.2d 216, 107 S.Ct. 353] (hereafter *Kelly*). In *Kelly*, the Supreme Court held that 11 United States Code section 523(a)(7)[3] preserves from discharge restitution obligations im-

---

[3] Section 523 provides: "Exception to discharge:

"(a) A discharge under . . . this title does not discharge an individual debtor from any debt—

". . . . . . . . . . . . . . . . . . .

posed as a condition of probation in state criminal proceedings. Restitution as a condition of probation was held not to violate section 523(a)(7) because it focuses on the state's interests in rehabilitation and punishment rather than the victim's desire for compensation. (*Kelly, supra,* 479 U.S. at p. 53 [93 L.Ed.2d at p. 230].) The decision to impose restitution generally "does not turn on the victim's injury, but on the penal goals of the State and the situation of the defendant." (*Id.* at p. 52 [93 L.Ed.2d at p. 230].)

Following *Kelly, supra,* 479 U.S. 36, we held in *Brookman* that especially when it is made payable to the State Bar Client Security Fund, restitution "is clearly for the benefit of the public at large, not the underlying victim . . . . Because such restitution fundamentally serves the goal of rehabilitation, it is not merely compensation to the government for 'actual pecuniary loss.' " (*Brookman, supra,* 46 Cal.3d at p. 1009.)

Subsequently, in *Hippard, supra,* 49 Cal.3d 1084, we held that an attorney's discharge in bankruptcy of indebtedness to clients and to the Client Security Fund arising from professional misconduct did not preclude the State Bar from considering, as an indicator of rehabilitation, the attorney's subsequent efforts to make restitution to his clients. There the attorney had misappropriated $3,967.66 from one client and additional amounts from two others, borrowed more than $22,000 from seven clients, and written checks on accounts that were closed or lacked sufficient funds. Two of the clients subsequently obtained restitution from the Client Security Fund.

Citing *Brookman, supra,* 46 Cal.3d 1004, we noted that the purpose of attorney discipline is to protect the public from specified professional misconduct and at the same time to rehabilitate the attorney. (*Hippard, supra,* 49 Cal.3d at p. 1093.) Because restitution would serve the state interest in " 'rehabilitating culpable attorneys (and protecting the public) by forcing the attorney to "confront in concrete terms, the harm his actions have caused" ' " (*ibid.*), we concluded that when the attorney's misconduct results in appreciable pecuniary loss to his clients, the State Bar may properly consider the absence of any effort to make restitution as an indicator of his lack of rehabilitation. (*Id.* at pp. 1093-1094.) This is the real significance of restitution, we held, not repayment of the underlying indebtedness.

The case at bar, therefore, can be distinguished from *Brookman* and *Hippard* in several ways. First, the debt that petitioner discharged in bankruptcy was a wrongful death judgment unrelated to his practice of law, not

---

"(7) to the extent such debt is for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss . . . ."

a debt owed as the result of professional misconduct. Our concern in reviewing a denial of an application for admission to practice law or a recommendation of professional discipline is unquestionably greater when the debt discharged in bankruptcy was incurred as the result of professional misconduct. Moreover, petitioner has successfully made a prima facie case of good moral character that is otherwise unrebutted by the State Bar; this clearly distinguishes the case at bar from *Brookman, supra,* 46 Cal.3d at page 1010, and *Hippard, supra,* 49 Cal.3d at page 1097. When, as here, the State Bar can advance no evidence sufficient to rebut a prima facie case of good moral character other than continued failure to satisfy a discharged obligation, denial of an application to the bar violates section 525(a).

 Second, the discharged obligation in this case was intended to compensate Smilanich, as the ultimate victim of petitioner's tortious conduct, for her private pecuniary loss; no governmental unit would benefit from revival of the discharged judgment. This is in contrast to *Brookman,* in which the Client Security Fund, and thus the "public at large," stood to benefit from the attorney's restitution. In the present case, the subject debt is neither related to petitioner's practice nor owed to one of his clients, thus also distinguishing it from *Hippard.*

Finally, consideration of petitioner's failure to compensate Smilanich despite the discharge of the judgment in bankruptcy does not further the State Bar's interest in protecting the public from professional misconduct and rehabilitating errant attorneys. In *Kelly,* the United States Supreme Court found that restitution is an effective rehabilitative penalty "because it forces the defendant to confront, in concrete terms, the harm his actions have caused." (*Kelly, supra,* 479 U.S. at p. 49, fn. 10 [93 L.Ed.2d at p. 228].) Unlike *Brookman* and *Hippard,* in which the restitution was related to underlying professional misconduct, the debt in this case is the result of an isolated 20-year-old drunk driving incident. While the Bankruptcy Act clearly permits the State Bar to consider petitioner's remaining "moral obligation" in evaluating his application to the bar, such consideration fails to serve any rehabilitative purpose as contemplated in *Kelly* and, as indicated above, the discharge must not be the sole reason for denying petitioner admission.

### DISPOSITION

In sum, petitioner has presented a strong prima facie case that he is of sufficiently good moral character to be admitted to the practice of law in California. The State Bar, on the other hand, fails to rebut either petitioner's showing of rehabilitation or his prima facie case. Accordingly, we order

petitioner admitted to the California Bar. This holding is consistent with our charge to protect the public and its confidence in the legal profession rather than to impose punishment. (*Gary* v. *State Bar* (1988) 44 Cal.3d 820, 827 [244 Cal.Rptr. 482, 749 P.2d 1336].) The State Bar has presented no evidence that petitioner is now a danger to the public in the practice of law or that he does not merit public confidence.

It is ordered that the Committee of Bar Examiners certify petitioner Richard E. Kwasnik to this court as a person qualified to be admitted to practice law.

This order is effective upon finality of this decision in this court. (See Cal. Rules of Court, rule 24(a).)

**KENNARD, J.**—I concur in the decision to admit petitioner Richard E. Kwasnik to the practice of law in California. In determining whether an applicant has the good moral character required of attorneys in this state, we are constrained by past decisions of this court, as the majority correctly notes, to focus primarily on the applicant's conduct during the recent past. By submitting evidence of his admission to practice in New York and Florida and several letters from lawyers and judges attesting to his moral fitness, petitioner has made a prima facie case that he possesses good moral character (see *Greene* v. *Committee of Bar Examiners* (1971) 4 Cal.3d 189, 192 [93 Cal.Rptr. 24, 480 P.2d 976]), and his behavior during the past five to eight years, as disclosed by the record before us, does not sufficiently establish a present lack of good moral character.

Nonetheless, it bears emphasis that petitioner's conduct during an earlier period of his life displayed a marked lack of those qualities of fairness, candor, and trustworthiness required of members of the legal profession. I write separately to emphasize this fact, lest our decision be misinterpreted as condoning petitioner's earlier behavior or as abdicating our responsibility to ensure that only those attorneys possessed of sound moral character be permitted to practice law in this state.

To qualify for admission to the practice of law in California, an attorney admitted to practice in another state must be "of good moral character." (Bus. & Prof. Code, § 6062, subd. (b).) This requirement applies also to nonlawyer applicants. (*Id.*, § 6060, subd. (b).) In admission proceedings, the fundamental question is generally considered to be whether the applicant "has committed or is likely to continue to commit acts of moral turpitude." (*Hightower* v. *State Bar* (1983) 34 Cal.3d 150, 157 [193 Cal.Rptr. 153, 666 P.2d 10]; see also, Bus. & Prof. Code, § 481; *Konigsberg* v. *State Bar* (1957) 353 U.S. 252, 263 [1 L.Ed.2d 810, 819-820, 77 S.Ct. 722].) This statement

aptly describes the practical limits of our inquiry, but unfortunately it conveys a mistaken impression of the moral character requirement.

The term "good moral character" embraces much more than the absence of demonstrated wrongful acts.[1] The State Bar's Rules Regulating Admission to Practice Law provide this definition: "The term 'good moral character' includes qualities of honesty, fairness, candor, trustworthiness, observance of fiduciary responsibility, knowledge of the laws of the state and the nation and respect for the rights of others and for the judicial process." (Rules Regulating Admission to Practice Law, rule X, § 101(a).) More than 30 years ago, United States Supreme Court Justice Felix Frankfurter gave this eloquent description of moral character and its specific importance to the legal profession: "[A]ll the interests of man that are comprised under the constitutional guarantees given to 'life, liberty and property' are in the professional keeping of lawyers. It is a fair characterization of the lawyer's responsibility in our society that he stands 'as a shield,' to quote Devlin, J., in defense of right and to ward off wrong. From a profession charged with such responsibilities there must be exacted those qualities of truth-speaking, of a high sense of honor, of granite discretion, of the strictest observance of fiduciary responsibility, that have, throughout the centuries, been compendiously described as 'moral character.'" (*Schware* v. *Board of Bar Examiners* (1957) 353 U.S. 232, 247 [1 L.Ed.2d 796, 806, 77 S.Ct. 752, 64 A.L.R.2d 288] (conc. opn. of Frankfurter, J.).)

This is the standard against which petitioner's conduct is to be measured. The record discloses the following facts bearing upon the issue under consideration.

Driving while intoxicated, petitioner was involved in an automobile accident in which Steven Smilanich was killed. The accident occurred in New York State, where petitioner resided and practiced law; it occurred in 1970, some three years after petitioner had begun his legal career. Smilanich's widow and three children brought a wrongful death action in which it was determined that petitioner's negligence had caused Smilanich's death. Judgment in the amount of $232,234 was entered against petitioner in July 1974.

---

[1] As one commentator has written: "To many lawyers, ethical rules are like road signs: not models of good behavior to emulate, but signposts of how much misbehavior is tolerable. The purpose of drawing a line in the sand has been to see how close one can come without stepping over it. This 'stepping over the line' mentality continues to color character and ethical assessments. Prospective lawyers learn where the line is and how close to come to it. Character determinations now assess more social conformity than moral integrity. The end result is the inculcation of the widespread minimum morality of 'how much can I get away with.' In lieu of this morality of minimal duty, the legal profession needs more uplifting standards of character to inculcate 'soul' rather than merely toeing the mark." (Gerber, Lawyers, Courts, and Professionalism: The Agenda for Reform (1989) p. 69.)

Petitioner's insurer paid the policy limit of $10,000, leaving an unpaid balance of over $220,000. Petitioner paid nothing on the judgment until the following year when he was served with a notice of levy. Petitioner then made biweekly payments of $42, the minimum required under New York law to avoid wage garnishment. At a postjudgment debtor examination in 1979, petitioner testified falsely that he did not have a joint interest in any checking accounts. Although he earned at least $100,000 between 1975 and January 1980 and lived rent-free in a home owned by his mother, petitioner paid only $4,649 toward the judgment during this time.

In June 1979, petitioner applied for admission to the Florida bar. In response to an inquiry by the Florida Board of Bar Examiners, petitioner falsely represented that he had paid $1,200 per year toward the $232,234 wrongful death judgment. On January 31, 1980, petitioner sent a letter to the attorney representing Smilanich's widow and children. In the letter petitioner said he was taking a leave of absence from his New York employment, would contact the attorney upon his return, and would notify the attorney if he were to relocate elsewhere. In fact, petitioner had already accepted employment in Florida and moved there the following month. Petitioner made no effort to give his Florida address to the attorney representing the widow and children. By moving to Florida, petitioner avoided the threat of wage garnishment, which is not permitted under Florida law. With his wages safe from garnishment, petitioner made no further payments on the wrongful death judgment. In late 1980, petitioner was denied admission to practice in Florida, based on the finding by the Florida Board of Bar Examiners that petitioner had engaged in a "pattern of conduct and practice, consisting of both outright misrepresentations of fact and shaded representations, calculated to avoid payment of any substantial sum on the judgment against him."

I interrupt the narrative here to express my agreement with the decision initially denying petitioner admission to the Florida bar. Petitioner's conduct demonstrated indifference to the moral and legal responsibilities he owed to the widow and children of the man killed by his negligence. Had petitioner applied for admission to practice in this state, the record as it existed at that time would have amply supported the conclusion that he lacked the requisite good moral character. (See generally, Annot., Failure to Pay Creditors as Affecting Applicant's Moral Character for Purposes of Admission to the Bar (1981) 4 A.L.R.4th 436.)

Petitioner offered $15,000 to settle the wrongful death judgment, which then had an outstanding balance in excess of $220,000. In November 1980, following the rejection of this offer, petitioner filed for bankruptcy. The wrongful death judgment was discharged in the bankruptcy proceeding in

March 1981. Petitioner then sought reevaluation of the decision denying him admission to the Florida Bar. When this petition reached the Florida Supreme Court in 1987, the court concluded that the only relevant consideration was whether petitioner could be denied admission based on his failure to pay the wrongful death judgment, or the underlying moral obligation it embodied, after the debt was discharged in bankruptcy. The court held that petitioner still owed a moral obligation to Smilanich's family,[2] but that consideration of this moral obligation after discharge of the legal debt in bankruptcy "would require the making of such subtle distinctions that no satisfactory rule could be devised." (*Florida Bd. of Bar Examiners Re: Kwasnik* (Fla. 1987) 508 So.2d 338, 339.) Accordingly, the court held that petitioner could not be denied admission to practice.

The effect of the bankruptcy on the determination of moral character requires some explanation, but I do not propose a detailed treatment of the topic in this concurring opinion. Briefly stated, once a debt has been discharged, neither the debtor's action in seeking and obtaining the discharge nor the failure to subsequently pay the debt may be used to deny admission to practice law (see 11 U.S.C. § 525(a)); however, the discharge does not insulate from scrutiny the debtor's conduct before the commencement of the bankruptcy proceeding (see *Application of Taylor* (1982) 293 Ore. 285 [647 P.2d 462, 465-467]; *Application of Gahan* (Minn. 1979) 279 N.W.2d 826, 829-832 [4 A.L.R.4th 426]). Thus, the debtor's failure to make good faith efforts to pay the debt over a period of years, accompanied by a pattern of conduct apparently designed to mislead the creditor and make enforcement more difficult, would support a conclusion that the debtor lacks good moral character.

In the present proceeding, the Review Department of the State Bar Court properly considered petitioner's predischarge conduct and correctly concluded that it demonstrated lack of good moral character. But nine years have passed since the bankruptcy discharge, and the question that must now be considered is whether petitioner's subsequent conduct sufficiently shows rehabilitation. (See *Pacheco* v. *State Bar* (1987) 43 Cal.3d 1041, 1051, 1057 [239 Cal.Rptr. 897, 741 P.2d 1138].) To encourage moral reformation, bar applicants whose recent conduct is free of reproach are ordinarily rewarded with the opportunity to serve in the legal profession. (*Hightower* v. *State Bar, supra,* 34 Cal.3d 150, 157.)

---

[2] Petitioner testified in the Florida proceedings in 1986 that he recognized a continuing moral obligation despite discharge of the legal obligation in bankruptcy. In the proceedings in this state, however, petitioner stated he has no moral obligation to pay anything on the wrongful death judgment. In his words, "[t]here is no difference between the law and morals."

Although there is some evidence that petitioner continues to be deficient in the frankness and candor required of an attorney,[3] this evidence is insufficient to overcome petitioner's prima facie case. We have accorded great weight to the opinions of attorneys and judges regarding an applicant's moral fitness to practice law. (*Pacheco* v. *State Bar, supra,* 43 Cal.3d at p. 1053.) Here petitioner produced an abundance of such evidence, which we are not at liberty to disregard. Also, petitioner has practiced law in New York and Florida for over 20 years without being the subject of disciplinary proceedings. While the issue of petitioner's present moral character is not entirely free from doubt, all reasonable doubts in admission proceedings are to be resolved in the applicant's favor. (*Hallinan* v. *Committee of Bar Examiners* (1966) 65 Cal.2d 447, 451 [55 Cal.Rptr. 228, 421 P.2d 76].)

For these reasons, I concur in the decision to admit petitioner to the practice of law in California.

**ARABIAN, J.**—I concur in the order to certify petitioner's admission to the practice of law in California, and in the views expressed in the opinion of Justice Kennard. I write separately, however, to emphasize the limited basis upon which that concurrence takes place, and to express my disagreement with certain aspects of the court's opinion.

In my view, the State Bar Court Review Department's recommendation denying certification was not, as suggested in the court's opinion, based "solely" on the discharged judgment. Rather, it appears the recommendation was based on the review department's assessment of petitioner's sustained pattern of misconduct, involving multiple acts of dishonesty and evasion. However, in view of the relative remoteness of petitioner's past acts of moral turpitude and giving the benefit of the doubt to petitioner (*Hallinan* v. *Committee of Bar Examiners* (1966) 65 Cal.2d 447, 451 [55 Cal.Rptr. 228, 421 P.2d 76]), I agree that the State Bar's presentation was insufficient to rebut petitioner's evidence of his present good character and rehabilitation.

### FACTS

A brief recitation of the facts is sufficient to demonstrate the pattern of petitioner's conduct.

The record indicates: (1) Petitioner unjustifiably caused the death of another in 1970 by his drunken driving, for which a judgment against him

---

[3] On his application for admission to practice in California, petitioner represented that he had left two jobs for "other employment" when in fact his employment had been terminated. When asked about this during the hearing, petitioner testified that he had used the misleading language because "[i]t looks better."

was rendered, in 1974, for over $232,000. Petitioner tendered his policy limits of $10,000 on that judgment. (2) Petitioner made no payments on the balance of the judgment until 1975 when, under threat of wage garnishment, he began making the minimum payments required to avoid garnishment, approximately $42 every two weeks. (3) From 1975 to 1980, he paid only $4,685 on this obligation. During the same period of time, petitioner earned between $15,000 and $32,000 annually, totalling at least $100,000,[1] while living rent-free and putting his wife through five years of college. (4) When petitioner was deposed in postjudgment debtor proceedings in 1979, he testified falsely that he did not have any joint bank accounts with his wife. (5) In 1980, petitioner misrepresented to the victims' attorney that he was taking a leave of absence from his job and would contact the attorney on his return, or notify him if he settled permanently elsewhere, and attempt to settle the case. In fact, petitioner had already accepted a job in another state, with the intent of making his permanent home there, and never made any attempt to contact the victims' attorney or inform the attorney of his whereabouts. (6) In 1979, petitioner applied for admission to the Florida State Bar. He represented on his application that the $10,000 automobile insurance policy was the only asset he had available to pay the judgment. The record indicates that in fact other assets were available. (7) Petitioner represented in an amended application to the Florida State Bar in February 1980 that he had paid approximately $1,200 per year on the judgment. Petitioner actually paid as much as $1,200 only in 1979 and paid significantly less in other years. (8) Petitioner represented in the amended application in February 1980 that he fully intended to continue all payments on the judgment in the future. Yet, on May 9, 1980, petitioner testified that he had stopped payment upon moving to Florida three and one-half months earlier, that is, in approximately February 1980. In addition, petitioner testified he stopped paying, not because of any inability to pay, but because his wages were not subject to garnishment under Florida law. He was at that time earning approximately $27,000 per year. (9) At a 1986 rehabilitation hearing before the Florida State Bar, petitioner was found to be less than candid, and could not satisfactorily explain why title to his New York home was held in his wife's name only.

### DISCUSSION

The enumerated matters are serious, involving moral turpitude, and if committed by a member of the State Bar would constitute a statutory ground for disbarment. (Bus. & Prof. Code, § 6106.) Moreover, contrary to

---

[1] Overall, petitioner paid about 4.6 percent of his income on the obligation during these five years. Petitioner failed to make even the $42 minimum payments on the obligation in at least three of the five years, and never increased his payments although he received raises in income during that time.

the intimation of the court's opinion (maj. opn., *ante*, pp. 1069-1070, 1072-1074), none of these considerations impinges improperly on the prophylactic purposes of the Bankruptcy Act. All relate to petitioner's conduct connected to the debt while it was valid and legal, before it was discharged in bankruptcy, or to ancillary matters in which he showed a pattern of deception, evasion and falsehood.

Nor do I necessarily agree that the misconduct is unrelated to petitioner's practice of law.[2] (See maj. opn., *ante*, pp. 1069, 1073.) Petitioner's misconduct involved a personal lawsuit, in which he testified falsely, made misrepresentations to opposing counsel, and failed to comply with the lawful judgment of the court. The misconduct also occurred in connection with petitioner's application for admission as an attorney in another jurisdiction, in which he made a number of misrepresentations and displayed a lack of candor at his "rehabilitation" hearing.

Nevertheless, as the court's opinion points out, most of these matters occurred in 1980 or earlier. Petitioner has established a prima facie case of his present good moral character. He introduced 15 character letters and testified that all but 3 of the references knew of his wrongful death judgment, subsequent bankruptcy, and Florida State Bar proceedings.[3] He has never been the subject of a disciplinary proceeding in New York in 20 years of practice. Much of that practice was devoted to representation of indigent criminal defendants. He practiced competently in that capacity and gained a reputation among his colleagues and among the judges in whose courts he appeared for diligence, honesty and integrity. He volunteered to serve in a unit handling the most difficult cases, and he spent time training and advising younger attorneys.[4] In addition, petitioner successfully fulfilled his duties as trustee of a $400,000 trust for his paraplegic cousin. He has also demonstrated a greater financial responsibility for the future by obtaining adequate liability insurance.

Petitioner has not maintained an entirely unblemished record since the discharge in bankruptcy. He was specifically found to be evasive and to lack

[2] Most candidates for admission to the State Bar have not previously practiced law. In my view, we do not regard misconduct evidencing moral turpitude as any less important because it did not occur in the candidate's practice of law. *In re Kreamer* (1975) 14 Cal.3d 524, 531 [121 Cal.Rptr. 600, 535 P.2d 728], does not establish such a lesser value for evidence of moral turpitude not actually committed in the practice of law. Rather, we were there evaluating the mitigating circumstances in disciplining an attorney who was already a member of the State Bar.

[3] None of the letters, however, makes specific reference to knowledge of these facts.

[4] It was brought out, however, at the 1986 Florida State Bar rehabilitation hearing that there were four attorneys of petitioner's level of experience in petitioner's department, and all four attorneys undertook, even though not expressly required by their job description, to train and counsel less experienced attorneys.

candor in regard to certain responses at his 1986 Florida State Bar rehabilitation hearing. This factor, however, while disturbing in light of his past misconduct, is not of itself sufficiently egregious to rebut his showing of present good moral character and his honesty and integrity in the 20 years that he practiced law in New York.[5]

As the record demonstrates, the State Bar here did *not* rely solely on petitioner's discharge in bankruptcy of the wrongful death judgment in recommending that petitioner not be admitted to the bar. However, I agree with the court's opinion that the evidentiary significance of petitioner's misconduct may have been attenuated by the passage of time. (See *Pacheco v. State Bar* (1987) 43 Cal.3d 1041, 1051 [239 Cal.Rptr. 897, 741 P.2d 1138].)

Accordingly, I would hold that the State Bar's evidence in rebuttal is not sufficient to demonstrate petitioner's present lack of good moral character, and I concur in the order for petitioner's admission to practice law in California.

**LUCAS, C. J.**—I dissent. Petitioner's conduct in relation to the wrongful death judgment against him, during proceedings before the Florida bar, and in the course of these proceedings indicates fundamental defects in moral character that warrant refusal to admit him to the practice of law in California. By focusing on each incident of petitioner's misconduct in isolation, the majority misses the larger picture. In the process, it misinterprets federal bankruptcy law and reaches a result contrary to our precedents.

It is useful to note at the outset what this case is *not* about. It is not about whether petitioner should be held to blame for the consequences of his drunk driving in 1970. It is not about his moral or legal right to avail himself of the bankruptcy laws. Finally, it is not about whether we "condone" his misconduct. Except insofar as petitioner's fitness *to practice law* is concerned, none of these questions is ours to answer. By losing sight of this fact, the majority fails to focus properly on the misconduct that *is* relevant to petitioner's fitness to practice: a continuing pattern of dishonesty, lack of candor, and evasion of legal and moral duties.

---

[5] I take issue with the court's statement (maj. opn., *ante*, p. 1071) that independent review of the record does not indicate that petitioner was anything but candid in the California admission proceedings. My independent review of the record reveals, although the matter was not made the subject of findings, that petitioner represented on his application for admission that he left two jobs for the reason of "other employment" when in fact he had been terminated from those jobs and had not yet secured new employment. Petitioner testified at his 1988 review department hearing that he chose to use the language "other employment" as the reason for leaving those jobs because "It looks better."

Rather than reiterate the facts, which I leave to the concurring opinions of Justices Arabian (see Arabian, J., *ante*, conc. opn. at p. 1082, fn. 5) and Kennard (see Kennard, J., *ante*, conc. opn. at p. 1079, fn. 3), I will focus on two shortcomings that pervade the majority opinion. First, I submit that its resolution of the legal issues raised by petitioner's discharge in bankruptcy is incorrect and inconsistent with our precedents. It should by now be beyond question that, in considering a person's moral fitness to practice law, we may take into account the implications of the discharge of a debt, particularly when accompanied by misconduct suggesting that the debtor lacks awareness of the moral implications of his wrongs. Second, I do not agree that petitioner's conduct over the past decade either indicates good moral character on its face or is so probative of rehabilitation from prior misconduct that his admission to the practice of law is warranted at this time.

## A. *Federal Law Does Not Prohibit Consideration of Petitioner's Bankruptcy and Accompanying Misconduct*

As the majority notes, a governmental unit may not deny a license to a person "solely because" he "has not paid a debt that . . . was discharged under the Bankruptcy Act." (11 U.S.C. § 525(a) (hereafter section 525(a).) For two reasons, I disagree with the majority's conclusion that refusing to certify petitioner on the evidence presented would violate this principle. (See maj. opn., *ante*, p. 1070.)

First, as Justice Arabian points out, petitioner has committed numerous acts indicating fundamental disregard for the suffering of others and basic dishonesty in dealing with the consequences of his actions. (See Arabian, J., *ante*, conc. opn. at p. 1080.) These acts involve "moral turpitude, dishonesty, or corruption" that would justify discipline if petitioner were already a member of the bar (Bus. & Prof. Code, § 6106), irrespective of and in addition to the discharge itself and the unlawful act giving rise to the debt. Denying him admission to the practice of law would be justified by this overarching pattern of abuse, not his failure to pay a discharged debt. Certainly it would not be "solely because" of the discharge. Thus, contrary to the majority's holding, the antidiscrimination rationale of section 525(a) is not implicated in this case, and no supremacy clause issue is presented.

Second, even if the sole issue in this case were petitioner's failure to pay a debt discharged in bankruptcy, our decisions make clear that section 525(a) does not foreclose consideration of the continuing indebtedness as an indicator of lack of rehabilitation from prior defects in moral judgment. This is the central teaching of *Brookman* v. *State Bar* (1988) 46 Cal.3d 1004 [251 Cal.Rptr. 495, 760 P.2d 1023], and *Hippard* v. *State Bar* (1989) 49 Cal.3d

1084 [264 Cal.Rptr. 684, 782 P.2d 1140]. The majority attempts to distinguish these cases. I submit neither is distinguishable in any principled manner.

In *Brookman*, we held that section 525(a) does not prohibit the state from requiring an attorney to make restitution of a discharged debt as a condition of disciplinary probation. (*Brookman, supra,* 46 Cal.3d at p. 1009.) It is true, as the majority here points out, that *Brookman*, unlike this case, involved a debt owed "as the result of professional misconduct" to a governmental unit rather than the victim of such misconduct. (See maj. opn., *ante*, pp. 1073-1074.) Neither the source of the debt nor the identity of the creditor, however, is *material to the primary reason* why we there upheld the restitution condition: "Such restitution is not imposed 'solely because' the attorney has failed to pay a debt discharged in bankruptcy; instead, it is imposed to protect the public and to help rehabilitate the State Bar member." (*Brookman, supra,* 46 Cal.3d at p. 1008.) Whether or not the debt stems directly from professional misconduct or is owed to a governmental unit, *Brookman* holds that we may consider its payment as an indicator of remorse and rehabilitation.[1] Because petitioner's rehabilitation from a course of dishonest and evasive behavior is certainly at issue in this case, we would not violate section 525(a) by considering petitioner's failure to pay his debt.

If the majority acknowledged this fact, it would also recognize that petitioner's discharge of and subsequent failure to pay his debt is highly relevant as an indicator of his lack of integrity in matters bearing intimately on his legal dealings. While testifying during these proceedings, petitioner contended that the discharge eliminated not only his legal obligation to repay his victims, but also his moral obligation to do so. His utter lack of remorse, combined with his continuing pattern of evasion and dishonesty over a 10-year period, warrants our refusal to admit him to practice law.

In *Hippard, supra,* 49 Cal.3d 1084, we held that discharge of a debt may be considered as an indicator of rehabilitation in a reinstatement proceeding

---

[1] Indeed, to hold that section 525(a) forecloses consideration of nonpayment of a discharged debt unless the debt is owed as a result of professional misconduct would make little sense. The pertinent inquiry in these proceedings is simply whether the debt (or its discharge) flows from or is evidence of some conduct indicating moral turpitude. Even in disciplinary cases (as opposed to ones involving admission to the bar), we have never suggested that acts involving moral turpitude are insulated from scrutiny by the bar if they were not committed in the course of professional conduct. Indeed, a California statute expressly states that acts involving "moral turpitude, dishonesty, or corruption, whether . . . committed in the course of his relations as an attorney or otherwise," constitute grounds for an attorney's disbarment or suspension. (See Bus. & Prof. Code, § 6106.) I doubt the majority intends to suggest that a person can circumvent professional discipline or inquiry into his good moral character by filing for discharge of a debt resulting from acts of moral turpitude in a nonlegal capacity. Unfortunately, its reasoning effectively achieves this result.

even though the petitioner acknowledged the discharge did not remove his moral obligation to repay his victims. (*Hippard, supra,* 49 Cal.3d at pp. 1090, 1095.) As *Hippard* instructs, "Restitution is to be considered as a factor in the overall factual showing made by the individual seeking reinstatement. The weight that should be attached to whether restitution has been undertaken in whole or in part is dependent upon the applicant's ability to restore the misappropriated funds as well as the attitude expressed regarding the matter . . . . In this context, the significance of restitution is its probative value as an indicator of rehabilitation, not the repayment of the underlying indebtedness." (*Id.* at p. 1093; see also *Brookman, supra,* 46 Cal.3d at p. 1009.)

When viewed in this context, petitioner's failure to pay his debt or acknowledge any continuing moral obligation is highly probative. As the evidence indicates, not only does petitioner possess the means to pay at least part of his debt, his attitude regarding the matter as a whole is hardly exemplary. His testimony that he no longer has any moral obligation to the victims of his drunk driving is but the latest indicator of his failure to "confront, in concrete terms, the harms his actions have caused." (*Kelly* v. *Robinson* (1986) 479 U.S. 36, 49, fn. 10 [93 L.Ed.2d 216, 228, 107 S.Ct. 353].) This failure, along with his recurrent dishonesty, warrants our refusal to admit petitioner to the practice of law.

The majority also errs in attempting to distinguish this case from *Brookman* and *Hippard* on the ground that here petitioner's debt is "the result of an isolated 20-year-old drunk driving incident" rather than professional misconduct, and therefore is irrelevant to the State Bar's interest in protecting the public from further misconduct. (See maj. opn., *ante*, p. 1074.) The origin of the debt should not be our focus here. Certainly it was not in either *Brookman* or *Hippard*. As these cases implicitly recognize, such a focus would convert the protection of section 525(a) into something much broader than was undoubtedly intended by Congress. (See *ante*, p. 1084, fn. 1.) The question is simply whether petitioner's course of conduct in the years *following* his drunk driving—not the drunk driving itself, or the judgment resulting therefrom—indicates lack of good moral character. Section 525(a) is irrelevant to this inquiry.

The majority here does not suggest that *Brookman* and *Hippard* were wrongly decided. By limiting them to their facts, however, it necessarily and without reason undermines their holdings. Instead, we should reaffirm that nothing in section 525(a) limits consideration of petitioner's failure to pay his discharged debt as one indicator—among many—of his poor moral character. Following our precedents, we should refuse to admit petitioner to the bar.

B. *The Evidence, Viewed as a Whole, Indicates Lack of Both
Present Good Moral Character and Rehabilitation From Past Wrongs*

The majority concludes that petitioner has shown a prima facie case of present good moral character (and necessarily of rehabilitation from prior acts indicating moral turpitude) (see maj. opn., *ante*, p. 1068), and that the State Bar fails to show otherwise. I disagree with both conclusions.

The majority's finding that petitioner has fulfilled his burden of showing rehabilitation rests on four factors. First, petitioner has introduced 15 letters from lawyers, judges, and a pastor attesting to his character. Second, he has practiced law in New York for over 20 years without any disciplinary record. Third, he has acted diligently in his capacities as an attorney and trustee of a trust established for his paraplegic cousin. Fourth, the Florida Supreme Court admitted him to the practice of law in 1987. (See maj. opn., *ante*, pp. 1068-1069.) Although at least the first three of these factors carry some weight in evidence of petitioner's good moral character, I do not believe they are as persuasive as the majority indicates. Similar, if not stronger, evidence of rehabilitation was presented in *Hippard, supra,* 49 Cal.3d at page 1090, in which we refused to reinstate the petitioner to the practice of law despite, inter alia, 27 letters on his behalf and the lapse of 10 years following his misconduct. In my view, petitioner's evidence similarly does not prove good moral character in this case.

The amount of evidence of rehabilitation required to justify admission varies according to the seriousness of the misconduct at issue. In this respect, the majority gives insufficient consideration to the severity and recurrent nature of petitioner's misconduct, which extended into these very proceedings. In part, this shortcoming results from its preliminary observation that because petitioner's misconduct is "not in any way related to [the] practice of law," we should accord it "less weight than we would professional misconduct in evaluating his moral fitness for admission to the bar." (See maj. opn., *ante*, p. 1069.) As Justice Arabian points out, this assumption is unwarranted and illogical. (See Arabian, J., *ante*, conc. opn. at p. 1081, fn. 2.)

We have never suggested that the probative value of misconduct involving moral turpitude or dishonesty varies according to whether it occurs in the practice of law. Indeed, as noted above (see *ante*, p. 1084, fn. 1), California law provides exactly the contrary. (See Bus. & Prof. Code, § 6106.) Thus, if petitioner has engaged in acts involving dishonesty (as the majority at least tacitly recognizes by focusing its discussion on petitioner's "rehabilitation"), it should make little difference whether or not those acts involved the practice of law. This should be particularly true in admission proceed-

ings, in which most persons in petitioner's position have no legal experience to be assessed.

Moreover, the majority's assumption that petitioner's misconduct is in fact not "related to the practice of law" is far from warranted. It is undeniably true that drunk driving, or filing for discharge of a debt, is not necessarily related to the practice of law. Petitioner's drunk driving and ensuing bankruptcy, however, are not the misconduct alleged in this case. Rather, the true issue is petitioner's dishonesty and disrespect for the legal process. His repeated intentional misrepresentations—false testimony in a 1972 deposition, false statements in a 1980 application for admission in Florida, false statements to an opposing attorney in 1980, misleading descriptions in his 1985 California bar application, and lack of candor in a 1986 Florida rehabilitation hearing—are unquestionably "related to the practice of law." By suggesting otherwise, the majority mischaracterizes their relevance to these proceedings and colors its discussion of their severity.

It is true, as Justice Arabian notes, that most of petitioner's misconduct occurred relatively long ago. Although for this reason the case is a close one, in my view the misconduct is not remote enough to warrant a conclusion that he should be admitted to practice.

The ultimate issue in these proceedings is whether we have faith, based on the evidence before us, that petitioner will uphold the duties of an attorney—that he will conduct his professional affairs with integrity and in an honest manner that will inspire public confidence in the profession. I cannot conclude he will. Within the past five years, petitioner has repeatedly made misrepresentations indicating failure to come to grips with his past. These misrepresentations concern not only the wrongful death judgment against him, but also matters such as his past employment and the reasons for termination thereof. In addition, petitioner has at no time during these proceedings indicated the sort of remorse for his past misconduct that inspires the confidence in his moral fitness we should here require. For these reasons, I would deny petitioner admission to practice law in California.