PER CURIAM.
Lonnie Groot applied for admission to The Florida Bar and passed all required portions of our bar examination. The Florida Board of Bar Examiners, acting as our agent for the admissions process,[1] undertook an investigation into his character, fitness and general qualifications to practice law in the state.[2] In its investigation, the Board learned that Groot had filed a voluntary petition for bankruptcy in 1977 and had been discharged from his financial obligations, including substantial student loans incurred to finance his education.[3]
The Board completed its findings and conclusions, and refused to recommend Groot for admission to the bar. After Groot exhausted his administrative remedies within the Board,[4] he petitioned the Court for admission,[5] challenging each of the Board’s conclusions and raising the general issue of the effect of a bankruptcy petition on a bar applicant’s fitness to practice law. We heard oral argument on February 6, 1978, to further crystallize the issues presented by Groot’s admission application.
Groot attended Florida State University as an undergraduate and law student, graduating in 1973 and 1976, respectively. He financed his undergraduate and law school education in part through student loans obtained from Florida banks and guaranteed by the federal government. At the time of his law school graduation in June 1976, these obligations totalled approximately $8,530. Repayment of these debts was to commence not later than one year after he ceased to carry at least one-half of a full-time academic workload — that is, in June 1977.
In July 1976, Groot successfully sat for the multi-state portion (Part II) of the Florida bar examination. In November 1976, he terminated his part-time employment with the Office of the Speaker of the Florida House of Representatives, where he was receiving a $14,000 annual salary, and moved to Helena, Montana. There he ac *166 cepted employment as a counselor with TriCounty DD (Developmentally Disabled), Inc., for compensation of approximately $4,800, plus living quarters, food and utilities. In December 1976, he secured additional employment with the Montana Legislative Council as a legislative legal aide, at a salary of approximately $13,000 per year.
Around May 1, 1977, Groot abruptly left his jobs in Montana and moved to Golds-boro, North Carolina. Although Groot had represented to the Council that he would remain in its employ for at least one full year, and had represented to Tri-County that he would remain on the job for not less than nine months, neither employer has indicated any dissatisfaction with his early departure. En route to Goldsboro he incurred gasoline credit charges, and while in Goldsboro (and unemployed) he incurred hospital debts for the birth of a child. These several debts, all of which were later discharged in bankruptcy, totalled approximately $900.
Groot successfully sat for Part I of the May 1977 bar examination, and in July 1977 he passed Part III of the bar examination. On June 30, 1977, he submitted an application for admission to The Florida Bar.
On or about August 18, 1977, Groot filed a voluntary petition for bankruptcy in the United States District Court, Eastern District of North Carolina, seeking to discharge his medical and travel debts and his accumulated student loan obligations. Approximately one week later he accepted a position as staff director of the Florida House of Representatives’ Committee on Standards and Conduct, at a salary of approximately $18,000 per year. He received a discharge in bankruptcy on November 11, 1977.
After undertaking an investigation into Groot’s background and character, the Board invited Groot to appear for an informal hearing. During that hearing, the Board inquired into circumstances surrounding Groot’s personal history which it felt reflected adversely on his fitness to practice law. The Board later advised Groot that he was entitled to a formal hearing on the matters of its concern, but Groot responded in writing denying the charges against him and stating that he did not want a further hearing before the Board.
The Board eventually recommended against Groot’s admission to practice, basing its decision principally on two grounds. First, it concluded that the chronology of events leading up to his filing of a petition for bankruptcy created serious doubt as to Groot’s motives for seeking a discharge of his debts. Specifically, the Board found from the record that Groot knowingly engaged in a course of conduct which (i) contributed to his inability to satisfy his debts in a timely and responsible manner, and (ii) caused them to be discharged without any attempt on his part to pay or renegotiate them. Second, the Board concluded that Groot had testified falsely under oath at his informal hearing in response to questions regarding his obligation to repay one of his student loans. In regard to the repayment of loans made by the Combank of Winter Park, Florida, Groot responded to one of the examiner’s questions:
“The loans to the Combank at Winter Park, I hadn’t entered any contract yet, so that was-whenever I entered an agreement to start repaying it, that’s when I would start repaying that one.”
The Board found that Groot well knew this testimony was false in that his obligation to begin repayment had been set to commence not later than one year from the date on which he ceased to carry at least one-half of a normal full-time academic work load.
Since oral argument before the Court, Groot has filed a number of communications and petitions with the Court, demanding his prompt admission to the bar and raising other matters which, for the most part, are irrelevant to this proceeding.[6]
*167 Groot basically asserts to the Court that there is nothing unethical either in his filing for bankruptcy or in the overall course of his conduct. We have already dealt with the first aspect of Groot’s argument. The filing of a petition for bankruptcy, standing alone, does not constitute sufficient cause to deny admission to The Florida Bar. Florida Board of Bar Examiners Re: G. W. L., 364 So.2d 454 (Fla.1978). As regards Groot’s assertion that his overall conduct reflects a fitness for admission to the bar, we find from the record no support for the Board’s conclusion to the contrary, and we therefore direct his admission to the practice of law.
The Board’s first finding relates to Groot’s prebankruptcy conduct. The record reflects Groot’s itinerancy from Florida to Montana to North Carolina, but it offers no basis on which to conclude that the various departures were motivated by unethical or improper considerations. Groot’s personal life was in disarray during this period, in part from problems which culminated in a divorce. The Board’s concern for Groot’s abrupt departure from gainful employment on several occasions provides no unethical gloss on his character, however, for in each case he left behind employers who were wholly satisfied with his prior performance and who later expressed to the Board a willingness to rehire Groot if he were desirous of returning to their employ.
The expenses attendant to these moves similarly suggest nothing with respect to Groot’s character, as they were both reasonable and necessary for the travel performed. It cannot be said from the record before us that these costs were incurred with a reckless disregard for their payment. Groot charged gas purchases on two credit cards which he validly owned. The fact that he later discharged these debts in bankruptcy, instead of paying them according to their terms, is the only basis of support for the Board’s conclusion that he initially incurred the charges recklessly or malevolently. Contradicting that view, however, is the record of Groot’s inability to secure employment in North Carolina. Similarly, he could not avoid the medical bills necessitated by the birth of his child.
It appears to us that, in evaluating Groot’s prebankruptcy conduct, the Board unduly emphasized Groot’s wandering and indecision during a period of his life when his personal affairs were at a low ebb. During that period Groot not only divorced his wife and had a child, but he found himself unable to obtain reasonable employment. Since the debts he later discharged were validly and properly incurred, it is irrelevant to an evaluation of his character that credit was extended by gasoline companies and a hospital at a time when Groot lacked the current capacity to repay the obligations. The mere fact that debts are incurred beyond a debtor’s present capacity to repay them is not, without more, an indication of immorality.
The course of Groot’s conduct up to August 1977, then, offers no basis to deny Groot admission to The Florida Bar. In that month, however, Groot secured the prospect of gainful employment and simultaneously took the initial legal steps to discharge his accumulated debts. The ultimate issue facing the Board, and now facing us, is whether it was morally reprehensible for Groot to set in motion the mechanism to avoid repayment of his debts at the very time he developed the capacity to begin repayment. The record shows that at the time Groot filed for bankruptcy, he was reasonably sure of employment with the Florida House of Representatives. Obviously, he intended to unburden himself of accumulated debts in order to retain, to the detriment of his creditors, the full financial benefits of his new employment. His right to exercise that choice, of course, is precisely the reason that the bankruptcy laws exist. As we held in Florida Board of Bar Examiners Re: G. W. L., a desire to “wipe *168 the slate clean” cannot alone be a basis to prevent admission to the bar. The real issue here, as in that case, is whether the Board could reasonably conclude from the record that Groot’s conduct under the circumstances was morally reprehensible. We think it was not.
Unlike G. W. L., Groot was the father and legal custodian of two children born of his recently-terminated marriage. His expenses included not only his own living costs and those of his dependents, but to some degree those of his former wife. When his personal resources became exhausted, he was forced to prevail upon family members to loan him the money, to meet current living expenses while he was without a job. Thus, unlike G. W. L., Groot had suffered unusual misfortune at the time he finally secured employment, and he had a valid present need to devote his entire employment income to his current, not past, financial responsibilities. His circumstances warranted his turning to the remedy provided by federal law for persons in just such situations, and we hold that Groot’s conduct under these circumstances is not morally reprehensible or indicative of a present unfitness for admission to the bar.
The Board’s second basis for rejecting Groot’s admission is reflected in its finding that Groot gave false testimony concerning repayment of his student loan to Combank of Winter Park. The one statement made by Groot at the informal hearing on which the Board relied, however, is misleading when considered in isolation. The statement is, in fact, completely accurate when considered in the context of Groot’s total testimony on the subject and the legal mechanisms which then existed for student loan repayments. It seems clear to us that Groot’s statement to the Board was intended to communicate only that he had not signed a promissory note and confirmed a repayment schedule for the Combank debt at the time he initiated bankruptcy. His student loans had been financed on the basis of a contract which called for the post-graduate execution of a formal legal instrument setting for the first time the exact terms for repayment. Although the debts had been incurred with an expectation that repayment was to commence not later than one year after graduation, the precise due dates and amounts of periodic payments had been left open for .embodiment in a later promissory note which, at the time of Groot’s quoted response before the Board, simply had not yet been executed. The Board’s treatment of this one statement by Groot at his informal hearing as a misrepresentation of the truth was not warranted. From the record as a whole, his response was truthful.
For the reasons expressed above, we direct the admission of Lonnie Neil Groot to the practice of law.
It is so ordered.
ENGLAND, C. J., and BOYD, SUND-BERG and HATCHETT, JJ., concur.
ADKINS, J., concurs in result only.
ALDERMAN, J., dissents with an opinion.
OVERTON, J., did not participate having recused himself pursuant to the provisions of Canon 3 C(l) of the Code of Judicial Conduct.

. Our authority to admit attorneys to practice in Florida derives from Article V, Section 15 of the Florida Constitution. The Board’s authority derives from the Rules of the Supreme Court Relating to Admissions to the Bar (1975 Revision), Article I, Section 2, 32 Florida Statutes Annotated 273 (Supp.1978).

. Fla.Sup.Ct. Bar Admiss.Rule, art. II, § 12.

. Since these events, however, federal law has been amended to provide that an adjudication of bankruptcy does not always discharge federal student loans. 20 U.S.C. § 1087-3 (1976).

. See Fla.Sup.Ct. Bar Admiss.Rule, art. II, § 12; Fla.Bd. Bar Exam.Rule VI, § 70, 32 Fla.Stat. Ann. 291 (Supp.1978).

. Fla.Sup.Ct. Bar Admiss.Rule, art. IV, § 20(a).

. For example, on June 14, 1978, Groot indicated that he had filed a complaint against three members of the Florida Board of Bar Examiners with the Florida Ethics Commission, based on their refusal to admit him to the practice of law. After the complaint was dis *167 missed because the bar examiners were found by the Commission not to be subject to the Commission’s jurisdiction, Groot notified the Court of his disagreement with the Commission’s decision.