[L.A. No. 31614. Apr. 21, 1983.]

MARTIN B., Petitioner, v.
COMMITTEE OF BAR EXAMINERS OF THE STATE BAR OF
CALIFORNIA, Respondent.

718

**COUNSEL**

Martin B., in pro. per., and Robert McMahon for Petitioner.

Herbert M. Rosenthal, Susan Mahony-St. Clair and Robert M. Sweet for Respondent.

**OPINION**

**THE COURT.**—Petitioner challenges the refusal of the Committee of Bar Examiners,[1] after adopting the findings of fact rendered by the State Bar Court, to certify him to this court for admission to practice law.

---

[1]Committee will be employed hereinafter to refer to the Committee of Bar Examiners.

In 1972, while in the Marine Corps, petitioner was charged with rape, robbery and kidnap. Two separate incidents were involved, and the cases were consolidated for trial in 1973. The first complaining witness claimed that petitioner raped her after offering her a ride home. She claimed that he had used a gun which appeared to be real. At the criminal trial, petitioner successfully claimed consent to intercourse as his defense, and was acquitted of the charges relating to this incident.

The second complaining witness claimed that petitioner had forced his way inside her van with what appeared to be a real gun, and forced acts of oral copulation and sexual intercourse upon her. At the criminal trial, petitioner claimed that he had been in San Diego at the time in question. The jury deadlocked 11 to 1 in favor of acquittal. Later, the trial judge dismissed the charges relating to this incident.

After the trial, petitioner was sent to Japan. He grew despondent and bitter that the military had not assisted him during his trial, and he developed a drinking problem. In October 1973, he was charged with filing a false claim against the United States Government to recover $1,346 for private property allegedly "stolen" from him while in the service. He pled guilty to the charge before a special court martial. He was sentenced to hard labor and restricted to the base for 30 days, forfeited part of his pay for 2 months and was reduced in grade to private. He continued to serve in the Marine Corps, however, and was later awarded three medals. He also received an honorable discharge from the Marines. Petitioner has since had an unblemished record.

The Committee initiated an investigation into petitioner's fitness to practice law in light of the rape charges and the false claim incident. Pursuant to the investigation, the State Bar Court conducted several hearings. No trial transcript had been prepared of the 1973 rape trial, nor had reporter's notes or the evidence introduced at trial been preserved. The State Bar Court pursued the matter and elicited testimony from witnesses, including the two complaining witnesses and petitioner: a "retrial" of the criminal charges.[2] The State Bar Court concluded that petitioner had committed the acts charged and had lied in his testimony to the State Bar Court in maintaining his innocence. The State Bar Court also found the 1973 false claim conviction to be indicative of bad moral character, despite petitioner's free admission of guilt and expression of remorse. The Committee, after reviewing these findings, refused to certify petitioner for admission to the bar.

Petitioner contends that (1) the rape charges should not have been relitigated because the passage of time had prejudiced his ability to defend himself, in

---

[2] The Committee elicited live testimony from the petitioner only at its hearing on May 7, 1982.

violation of due process, (2) the State Bar Court and the Committee should have given great weight to the favorable termination of the 1972 charges, (3) the State Bar Court erred in not employing a reasonable doubt standard in finding that petitioner had lied, (4) sufficient rehabilitation had been shown since the 1973 false claim conviction, and (5) he had met his burden of making a prima facie showing of good moral character.

We conclude that the conducting of a "retrial" when vital records no longer existed was inherently unfair to petitioner. We also conclude that the false claim conviction, by itself, was insufficient to justify nonadmittance. Thus, the record does not support the Committee's decision. We therefore remand these proceedings to the Committee for reconsideration of petitioner's moral character and fitness to become a member of the California State Bar.

## 1. EVIDENCE OF THE 1972 RAPE CHARGES.

■ It is well established that the Committee may initiate an investigation into criminal charges against an applicant to the bar, even if those charges resulted in a favorable termination to the applicant. The doctrine of res judicata does not apply to Committee proceedings, because the purpose of the proceedings is to determine moral fitness, rather than to punish a guilty party. Furthermore, the parties to the proceedings, as well as the quantum of proof, are different from those of a criminal trial. (*Wong* v. *State Bar* (1975) 15 Cal.3d 528, 531-532 [125 Cal.Rptr. 482, 542 P.2d 642]; *Emslie* v. *State Bar* (1974) 11 Cal.3d 210, 224 [113 Cal.Rptr. 175, 520 P.2d 991]; *Zitny* v. *State Bar* (1966) 64 Cal.2d 787, 790-791, fn. 1 [51 Cal.Rptr. 825, 415 P.2d 521]; *Best* v. *State Bar* (1962) 57 Cal.2d 633, 637 [21 Cal.Rptr. 589, 371 P.2d 325].)

In its investigation, however, it is important that the Committee maintain a certain degree of integrity. An applicant must be afforded a fair and reasonable opportunity to defend himself against the charges being investigated. When no such opportunity has been given, we must use our supervisory power over the Committee to invalidate the proceedings.

■ In the case at bar, petitioner was denied such a fair and reasonable opportunity to defend himself against charges to which he has steadfastly maintained his innocence for over 10 years. Because no trial transcript existed, no reporter's notes were kept, and the evidence introduced had been destroyed, petitioner could not meaningfully defend his position. He could not properly cross-examine the complaining witnesses, because their prior statements made at trial, which may have been inconsistent, were not available. Nor could any other witness have been properly impeached.[3]

---

[3]The testimony of Mr. Moseley at the State Bar Court hearings is a prime example of the disadvantage to petitioner. Mr. Moseley was the deputy district attorney who prosecuted the

Several of the petitioner's witnesses had become unavailable—some had died, others had moved out-of-state and thus beyond the reach of our subpoena power.[4] Since petitioner had received a favorable termination 10 years ago, it is more than likely that these witnesses had contributed in a material fashion to that favorable termination. Petitioner could not introduce their former testimony because it had not been preserved. The nonexistence of the records also inhibited his ability to challenge the validity of an allegedly suggestive photographic lineup, or to locate or identify a hostile witness whose testimony in the 1973 trial indicated that a complaining witness had perjured herself.

The trial judge is now deceased; we cannot be enlightened by his memory of the trial. Finally, petitioner could not properly refresh his *own* memory of the incidents; and, after nine years, they could well have become murky, especially if those memories were ones petitioner would rather have forgotten.[5]

---

1972 case against petitioner. Because there was no trial transcript available, he was asked to recall testimony presented at the 1973 trial. The examination of this witness produced the following exchanges:

"By Mr. PATRICK: Now, while you were at the trial and listening to Mr. [B.'s] testimony, do you recall Mr. [B.] testifying with respect to whether or not he had ever been in Newport Beach before November 19, 1972? [Petitioner's counsel objected to the line of questioning, but, after much discussion, the question was allowed.]

"[Prosecuting attorney]: . . . She obtained a ride with some people . . . . That was her testimony . . . . And she testified they went out MacArthur Boulevard . . . .

"MR. MORGAN: I again state that I think the Panel is troubled very much by hearing a record of this case through the recollections of the prosecuting attorney. [But] I think we have to let this testimony in . . . .

"[Petitioner's counsel]: . . . Where is the transcript? Where is the court reporter? This man [district attorney] is testifying to something that happened nine years ago. He has testified to something that in effect says that Mr.[B.] lied at a prior judicial proceeding. We don't have the precise question. We don't have the precise answer.

"Are we going to find that Mr.[B.] has lied when we don't know what he said except from a prosecutor of Mr. [B.] what his recollection is nine years later?

"MR. MORGAN: Mr. McMahon, I think all of your arguments [to strike the prosecutor's testimony] are excellent. I also believe that the panel is capable of evaluating the testimony in light of those arguments. And, therefore, I'm going to overrule the motion to strike."

[4]Petitioner admitted that he did not fully pursue obtaining the testimony of the out-of-state witnesses. (Apparently, the Committee had sent his notice of hearing to the wrong address, and he did not receive it until 10 days before the hearing; at that time, he was unaware of the nonexistence of a trial transcript.) Even if he had pursued the matter, the witnesses could have refused to comply. Regardless, absent a transcript, he could not have properly impeached any unfavorable testimony, nor could he have properly refreshed memories that likely would have been faulty.

[5]For example, petitioner was questioned repeatedly at the State Bar Court and Committee hearings whether a cap gun or a squirt gun had been found in his car and introduced at trial. Petitioner had difficulty recalling which gun had been found. The following transcript is illustrative:

"Q. At the time of your arrest, did you have a cap gun in your car?

"A. I don't recall if it was that or the squirt gun. I had a pistol. I don't know which.

"........

"Q. Did you have possession of a cap pistol?

"A. I may have had possession.

"Q. When you say you may have, you don't know for sure?

"A. I have had rifles, bows and arrows, beach balls. My car has been a toy box on numerous

Thus, petitioner was significantly impaired from presenting a defense at the Committee hearings. We therefore conclude that the "retrial" conducted by the State Bar Court and the Committee was fundamentally unfair, and any conclusions drawn therefrom must be disregarded.[6]

 Under normal circumstances, when the Committee's findings rest primarily upon testimonial evidence, we give great weight to those findings. (*Bernstein* v. *Committee of Bar Examiners* (1968) 69 Cal.2d 90, 101-102 [70 Cal.Rptr. 106, 443 P.2d 570].) When there has been a previous civil trial, however, deference is instead given to the findings of the *trial court,* which is "in a better position than the subcommittee or this court to determine the factual issues." (*Id.,* at p. 102.) Similarly, when there has been a previous criminal trial which resulted in a favorable termination to an applicant to the bar, this court discounts its normal degree of reliance on the Committee's findings, and gives very serious consideration to the favorable termination. (*Siegel* v. *Committee of Bar Examiners* (1973) 10 Cal.3d 156, 173, 178 [110 Cal.Rptr. 15, 514 P.2d 967]; see also *Wong* v. *State Bar, supra,* 15 Cal.3d 528, 532.) Here, however, we cannot compare the testimony or evidence introduced at the criminal trial to that introduced at the State Bar Court and Committee hearings; thus, we cannot examine the differences in each to determine why different conclusions had been reached. In addition, we do not know whether any of the testimony given at the various hearings was reliable, because no trial transcript exists to reveal inconsistent testimony by *any* witness. Thus, fundamental fairness dictates that we give no consideration to the findings of the State Bar Court and the Committee.

## 2. THE CONCLUSION THAT PETITIONER WAS LYING.

---

occasions. I don't recall any particular testimony about the cap gun.

"Q. Did you ever use a cap gun or did you ever testify that you used a cap gun that you kept in your car for sporting events?

" . . . . . . . . . . . . . . . . . . .

"[Petitioner's counsel]: . . . But asking him if he testified he had a gun is irrelevant, particularly under the circumstances that there is no transcript of any such testimony. It's not foundational for impeaching him with a transcript if there is no transcript available." (Panel conferring.)

"MR. MORGAN: We recognize there is no transcript. That creates the very problem that we have before us. We are going to admit the question and the witness please answer.

"A. May I have that read back to me?" (The reporter read from the record.)

"A. Not to my knowledge, no."

[6]We recognize that the facts of this case may well border on a violation of due process, and that a person cannot be excluded from the practice of law on grounds violating this constitutional protection. (See *Schware* v. *Board of Bar Examiners* (1957) 353 U.S. 232, 238-239 [1 L.Ed.2d 796, 801-802, 77 S.Ct. 752, 64 A.L.R.2d 288].) We choose not to reach this issue, however, and instead use our supervisory powers over the Committee to invalidate the proceedings below as they pertain to the 1972 rape charges.

The State Bar Court concluded that petitioner was lying in his testimony regarding the 1972 rape charges.[7] In essence, however, this conclusion is no different from finding petitioner guilty of the charges, since the alleged falsehood is his claim of innocence. Thus, this conclusion is vulnerable to the same infirmities as the finding of guilt.[8]

Special problems arise when a finding of falsehood is based upon a denial of guilt. Had petitioner expressed guilt and remorse, the Committee would not

---

[7]In its decision, the State Bar Court made the following conclusions:

"1. Applicant's testimony . . . was false in that . . . Miss G. did not consent to sexual intercourse with Applicant voluntarily, but rather submitted to such intercourse under fear of Applicant's threats.

"2. Applicant's testimony . . . was false in that . . . Applicant threatened Miss G. with a device that he told Miss G. was a hand gun and that she reasonably believed to be a hand gun.

"3. Applicant's testimony . . . that he was not the person who perpetrated the acts against Mrs. L. . . . was false in that Applicant was the person who committed such acts.

". . . . . . . . . . . . . . . . . . . . . . . . . .

"5. Applicant has demonstrated a lack of good moral character in committing the acts described [above], and in testifying falsely regarding such acts before the panel [that he did not threaten Miss G. with a gun or toy gun, that she had voluntarily consented to intercourse with him, and that he had not perpetrated the alleged crimes against Mrs. L.]"

The Committee now insists that petitioner had lied because he made conflicting statements at the hearings. (One example cited is the testimony concerning the toy gun (see fn. 5, *ante*). Our examination of the record, however, indicates that petitioner's testimony had been consistent in that petitioner at all times admitted that *a* gun was found, that at some point in time a cap gun was left in his car that was used in sporting events, and that a squirt gun had also been left in his car, but that he could not recall which of the two was found at the time he was arrested.) At any rate, it is clear from the decision of the State Bar Court (the findings of which were adopted by the Committee) that the basis for concluding that petitioner had been lying was not that he had elicited inconsistent testimony, but rather that the court had chosen to believe the complaining witnesses' versions of the facts rather than petitioner's.

[8]Petitioner argues, in the event we decide to allow a retrial, that the Committee nevertheless should have found that he was lying beyond a reasonable doubt. Such a standard was required in *Siegel* v. *Committee of Bar Examiners, supra,* 10 Cal.3d 156, 178-179.

*Siegel* involved a former student who had made speeches on campus. He was later arrested and charged with advocating violence, but was acquitted at trial. The State Bar questioned Siegel at a moral fitness hearing whether he had advocated violence. Siegel responded in the negative. The Committee nevertheless found that he was lying, and therefore unfit to be certified to practice law in this state. We granted review and ordered Siegel admitted to the bar, holding that in cases where the free exercise of First Amendment rights was in question, the Committee must find an applicant to be lying beyond a reasonable doubt.

The case at bar is not a First Amendment case, yet it does raise the question whether an applicant who is severely disadvantaged in asserting a defense is entitled to the same protection, as a "cure" to the unfairness present. Even if we imposed the *Siegel* rule, however, it would still be substantially difficult for petitioner to convince the State Bar Court and Committee that he is truthful, even with a reasonable doubt standard, when petitioner lacks the benefit of a trial transcript to support his case. The integrity of the Committee hearing process necessitates the better rule of excluding all evidence of the 1972 incidents, rather than placing petitioner in a disadvantageous position, even if he were protected by the higher *Siegel* standard.

We also recognize that the question left open in *Siegel*—whether an acquittal of criminal charges on the merits, by itself, satisfies petitioner's burden of showing a reasonable basis for his testimony (and thus that his testimony is truthful)—might be answered in the affirmative under facts such as these. We find it unnecessary, however, to address this question, since we have decided to exclude the evidence of the 1972 charges altogether.

have found that he had "lied" at the hearings; the passage of nine years' time with an unblemished record probably would have sufficed to show rehabilitation and bring about his admission. Petitioner, however, was acquitted of three of the charges long ago, and had the remaining charges dismissed; he should not be forced to now claim guilt, particularly since he has remained adamant about his innocence for the past ten years. Otherwise, it would leave the door open to a dangerous practice by the Committee to force applicants previously acquitted of criminal charges, or even merely arrested with charges later dropped, to "admit" guilt. Not only does such coercion damage one's reputation and self-esteem, it forces applicants to lie. Dishonesty is a quality we wish to prevent, rather than promote, in the members of our bar.

In a somewhat analogous situation, a previous applicant to the bar was denied certification by the Committee because he refused to admit guilt or remorse for several incidents for which a state licensing bureau had suspended his employment agency license for 20 days. We ordered him admitted to the bar, finding his "[r]efusal to retract his claims of innocence and make a showing of repentance appears to reinforce rather than undercut his showing of good character. . . . [¶] An individual's courageous adherence to his beliefs, in the face of a judicial or quasi-judicial decision attacking their soundness, may prove his fitness to practice law rather than the contrary. *We therefore question the wisdom of denying an applicant admission to the bar if that denial rests on the applicant's choosing to assert his innocence regarding prior charges rather than to acquiesce in a pragmatic confession of guilt, and conclude that [he] should not be denied the opportunity to practice law because he is unwilling to perform an artificial act of contrition.*" (*Hall* v. *Committee of Bar Examiners* (1979) 25 Cal.3d 730, 744-745 [159 Cal.Rptr. 848, 602 P.2d 768]; italics added.)

### 3. THE FALSE CLAIM CHARGE

Eight months after his rape trial in 1973, petitioner was charged with filing a false claim with the United States Government. He pled guilty to the charge before a special court martial.

This incident was raised at the State Bar Court and Committee hearings. Petitioner admitted his guilt in the incident, and expressed remorse. The State Bar Court and the Committee found the incident to be a factor indicative of present bad moral character.

 At age 21, petitioner, despondent and bitter over his rape trial in which he received no assistance from the Marine Corps, developed a drinking problem. It was under these circumstances that he submitted the false claim. It appears to have been an isolated incident of dishonesty. Since then, petitioner appears to have matured, overcome his alcoholism, attended college and law school, and has demonstrated his ability to work in the setting of a law office in a professional manner. In the past, we have considered participation in

unlawful incidents at an early age to be youthful indiscretions, which should not bar admittance to our bar after several years of law-abiding conduct. (See, e.g., *Hallinan* v. *Committee of Bar Examiners* (1966) 65 Cal.2d 447, 464, 466, 467, 469 [55 Cal.Rptr. 228, 421 P.2d 76].)

We also note that the passage of nine years with an unblemished, exemplary record, in itself, should be sufficient to show rehabilitation. Had petitioner been disbarred, after five years he could have filed an application for reinstatement. (Rules Proc. of State Bar, rule 662.) We would have reinstated him upon a showing of "[s]ustained exemplary conduct over an extended period of time that [he has] reattained the standard of fitness to practice law." (See *In re Petty* (1981) 29 Cal.3d 356, 362 [173 Cal.Rptr. 461, 627 P.2d 191] (theft and forgery); see also *In re Conflenti* (1981) 29 Cal.3d 120, 124-125 [172 Cal.Rptr. 203, 624 P.2d 253] (receiving stolen goods); accord, *In re Monaghan* (1966) 126 Vt. 53, 60 [222 A.2d 665, 671] (violence and violations due to intoxication).) At the State Bar Court and Committee hearings, petitioner presented the testimony and letters of several attorneys for whom he had worked that he had diligently performed his duties in a professional manner. This evidence supports a showing of the requisite exemplary conduct over an extended period of time, suggesting that the 1973 false claim incident is not a sufficient indication of present bad moral character.

4. CONCLUSION.

We have concluded that the State Bar Court and the Committee erred in conducting a "retrial" of the 1972 rape charges in this case, because the lack of vital records, the passage of time and the unavailability of certain witnesses caused the proceedings to be fundamentally unfair to petitioner in asserting a defense to the charges. In order to properly administer justice in these hearings, we hold that testimony and evidence of the charges should be disregarded. Thus, the findings that petitioner was guilty of the crimes and that he was lying during the proceedings are invalidated.

We also hold that the passage of time with an unblemished record renders the filing of a false claim, by itself, insufficient to justify nonadmittance.

This case is therefore remanded to the Committee for further proceedings.

**RICHARDSON, J.**—I concur in the majority's result, but not in its reasoning.