**In re Robert BAKER, Petitioner.**

**No. 88–223.**

District of Columbia Court of Appeals.

Argued June 21, 1990.
Decided Aug. 14, 1990.

David B. Isbell, with whom Thomas S. Williamson, Jr. and David J. Bederman, Washington, D.C., were on the brief, appointed by the court as amici curiae, for petitioner.

Charles L. Reischel, Washington, D.C., for respondent, Committee on Admissions.

Before NEWMAN, FERREN and TERRY, Associate Judges.

NEWMAN, Associate Judge:

Robert Baker applied for admission to the Bar of the District of Columbia on December 2, 1985, pursuant to Rule 46(c)(3)(i) of the Rules of the District of Columbia Court of Appeals, which permits an active member in good standing for five

years of the bar of another jurisdiction to be admitted without examination upon a showing of good moral character as it relates to the practice of law. The Committee on Admissions ("Committee") initially declined to certify his application for admission on grounds that he had not been actively engaged in the practice of law for five years and that he failed to demonstrate good moral character due to his evasiveness and lack of candor in responding to the Committee's inquiries. On remand, the Committee again refused to certify his application, this time relying solely upon the ground that Baker had failed to demonstrate good moral character. Having reviewed the record and briefs filed in this matter, we order that Baker be admitted to the bar.

## I

Baker graduated from the San Fernando Valley College of Law in May 1975. After eleven unsuccessful attempts to pass the California bar examination, he took and passed the July 1980 Georgia bar examination and was admitted to that state's bar on November 13, 1980. Baker went on to fail the California bar examination five more times. On June 9, 1981, he was admitted to the bar of the Tax Court of the United States, and on January 14, 1985, he was admitted to the bar of the United States

Court of Military Appeals. He filed an application for admission to the Bar of the District of Columbia on December 2, 1985, and while that application was pending passed the Utah bar examination and was admitted to the Utah Bar on October 6, 1987.

Baker moved to Atlanta, Georgia in November 1980, where he sublet an apartment and established what is called a "profile" office in a downtown office building, which provided him with meeting, mail, and telephone facilities. During this time Baker also owned a house in California, and evidence suggests that he was physically located in California much or most of the time. In September 1985, Baker left Georgia to study law in an LL.M. program in Brussels, Belgium for one academic year.

Pursuant to Baker's application for admission to the Bar of the District of Columbia, a routine report was prepared by the National Conference of Bar Examiners and received by the Committee on March 17, 1986. The report included six letters from character references attesting to his integrity, character, and legal ability.[1] In addition, there were letters from independent sources, including the schools he attended, former employers, other bars to which he had applied or been admitted, all of which indicated that he had a clean record with respect to disciplinary matters.[2] However,

---

1. Baker's report contains the following character reports submitted on behalf of Baker by his references: (1) Character Report of P.M.V., Beverly Hills, CA, Feb. 27, 1986, personal and business relationship of 12 years ("He is a very honest individual with extremely high moral character."); (2) Character Report of N.M., Beverly Hills, CA, Jan. 27, 1986, 8 year personal relationship ("[C]haracter and fitness for the practice of law is impeccable, as is his integrity."); (3) Character Report of P.S., Atlanta, GA, Feb. 4, 1986, 5 year personal and business relationship ("He is a fine young man w/a great personality."); (4) Character Report of E.K., Los Angeles, CA, Jan. 27, 1986, former employer who has known Baker for 10 years ("I have found the applicant to have integrity and fine character appropriate for the practice of law."); (5) Character Report of S.Y.L., Esq., Los Angeles, CA, Feb. 24, 1986, Baker had an "of counsel" relationship with L.'s law office, ("I have known Bob Baker for over ten years and have found him to be of the utmost moral character and of the very finest of professional integrity."); and

(6) Character Report of L.C., Pleasant Hill, CA, March 7, 1986, personal and business relationship of over 10 years ("[Baker] has handled legal matters for my immediate family and friends.... I have always found Robert Baker to be very responsible in both business and personal matters.... His integrity is above question. I have found him most competent in our legal matters.").

2. These sources were as follows: (1) Los Angeles City College, (2) the Georgia Justice Center, (3) the United States Tax Court, (4) the Board of Attorneys['] Professional Competence of the Supreme Court of Wisconsin (noting that Baker had applied for admission by motion and then withdrawn to meet the three years of active practice requirement), (5) the Utah State Bar (noting that Baker had applied to take the Bar examination and then withdrawn), and (6) Southeast Management and Leasing Corp. (noting that it owned the building in which Baker's landlord, Law Offices Ltd., leased a "profile office" to Baker).

a portion of the report indicating difficulty in obtaining from Baker references in Georgia who could verify his practice there and that Baker was not listed in Martindale–Hubbell or the Atlanta telephone directory during portions of 1981 and 1983, raised concerns at the Committee that Baker had not satisfied the requirements of Rule 46(c)(3)(i), which the Committee understood to be that Baker have actively practiced law in Georgia for the five years preceding his application.

The Committee asked Baker to attend an informal hearing on July 8, 1986 to pursue the matter. In connection with this hearing, the Committee asked Baker to provide documentation relating to his Georgia practice, including copies of Schedule C to his Form 1040 tax returns for 1981 through 1985, the five years preceding his application, showing annual telephone expenses, and the names of clients or attorneys who could furnish the Committee with information regarding his practice in Georgia.

On October 6, 1986, following a reminder from the Committee, Baker submitted the Schedule C information regarding his telephone expenses for the five years in question. Apparently, he wrote the information on blank Schedule C forms and submitted them to the Committee, rather than submitting copies of the actual forms he had submitted to the IRS. On March 7, 1987, the Committee informed Baker that it would not certify his application.

Baker requested a formal hearing, pursuant to Rule 46(f), and one was held on June 2, 1987. Members of the Committee questioned Baker on two main issues concerning his application: the nature and extent of his Georgia practice and his response to Question 12 on his application, which requests information regarding an applicant's application, and/or admission to the bars of other jurisdictions.

Concerning the first issue, Baker was asked by several members of the Committee for the names of his Georgia clients. Baker stated that there were three: his girl friend, Pam King, to whom he had given advice on one occasion concerning the preparation of her 1982 personal tax return, and two Atlanta attorneys, Kenneth Webb and Robert McCormack,[3] whom he had served in an "of counsel" role regarding the tax problems of their clients.[4] He also stated that he had served other attorneys located outside Georgia in similar fashion; he said that this practice was conducted over the phone.

As part of its inquiry into the nature and extent of Baker's Georgia practice, the Committee also questioned Baker about his telephone expenses during the years 1980 through 1985. The Committee asked Baker to submit copies of his complete federal and state tax returns for 1981 through 1985. Baker asked if in doing so he could block out information not relevant to his telephone expenses, and the Committee agreed to his request.

Regarding the second issue, Baker was asked why he had indicated in his response to Question 12 only his first unsuccessful attempt to pass the California Bar examination when he had in fact taken and failed the exam sixteen times. Baker explained that as he understood the question he was being asked to list each state in which he had applied for the bar and not each time

3. In the Appendix to the Memorandum of Points and Authorities Baker has filed with this court, Baker includes letters from these two attorneys. One is a letter from Robert E. McCormack, III Esq., of Atlanta, GA, dated July 3, 1985. It reads: "To Whom It May Concern: I have been practicing law in the State of Georgia since 1977. In my practice I have become acquainted with Robert Baker. I believe him to be a person of high moral character, keen intelligence, and great legal acumen." By the date of this letter, it appears that it was written in support of one of Baker's prior applications to Bars other than our own. The second is a letter from Kenneth D. Webb, Esq., also of Atlanta, GA, dated June 11, 1987. It reads: "TO WHOM IT MAY CONCERN: I am delighted to state that I am acquainted with Robert Baker. He previously maintained his office for the practice of law in the same suite of offices as mine."

4. Baker explained his dearth of clients by saying that he had experienced a great deal of difficulty breaking into the legal market in Atlanta. He opined that this difficulty was due to his being an outsider or a non-southerner.

within each state he had done so.[5]

Following the hearing, Baker sent a letter to the Committee, refusing to provide copies of the tax forms requested by the Committee. Noting that he had testified under oath concerning his telephone expenses and Georgia practice, he asserted that by requesting copies of his returns the Committee was questioning his veracity under oath, which he felt in turn was a direct challenge to his "religious convictions." The Committee again decided not to certify his application.

On March 8, 1988, the Committee presented its Report of Findings and Conclusions on Moral Character and Fitness to Practice Law of Applicant Robert Baker ("Report") to this court. In its Report, the Committee gave two grounds for its refusal to certify Baker's application: that he had not been actively *engaged in the practice of law* for five years prior to his application in Georgia,[6] and that he had not demonstrated good moral character by his evasiveness and lack of candor in responding to the Committee's inquiries into his practice and background.[7]

As to the first ground, the Report determined that Baker had not maintained an active practice in Georgia for five years and that he had not maintained a continuous residence there. As to the second ground, the Report faulted Baker not only for evasiveness and lack of candor in responding to the Committee's inquiries, but also because in noting that he had failed the California bar examination on his application, he had not indicated that he had failed the examination more than once.

Baker filed a Memorandum of Points and Authorities with this court in opposition to the Report on May 19, 1988, which included an Appendix containing a number of letters from persons attesting to his active membership in the Georgia State Bar.[8] On September 16, 1988, we received a brief from the Committee. After reviewing these documents, we remanded the matter to the Committee for an explanation of its basis for construing Rule 46(c)(3)(i) as requiring an applicant to have actively practiced law in another jurisdiction, as opposed to having been an active member of the bar of another jurisdiction. *In re Robert Baker,*

5. Question 12 of the application questionnaire reads:

> *List every state* to which you have ever submitted an application to be admitted by exam, motion or diploma privilege (or reinstated) to the bar, even if you subsequently withdrew the application. For each application indicate the date it was submitted *or the first exam taken and its ultimate disposition* (admitted to the bar, withdrew application, or not admitted). Explain any withdrawals or applications or failures to be admitted (other than those due to failing the examination). (Emphasis added.)

6. Report at 1 n. 1 ("When viewed in combination with Mr. Baker's inability or unwillingness to supply references who could substantiate his having maintained an active practice in Georgia, and Applicant's lack of a client base in Georgia (Mr. Baker could identify for the Committee only one Georgia client that he had in five years of practice), the Committee is of the opinion that Mr. Baker does not meet the requirements for admission under of (sic) Rule 46(c)(3)(i).").

Further, in response to a question from Baker as to the purpose of this rule, Judge Kelly, Chairperson of the Committee, advised him: "Well, the purpose, of course, is to determine whether or not you practice ... [A]nd it is the

purpose of this hearing to determine whether or not you actually practiced law in Georgia."

7. *Id.* at 2.

8. Some of the letters submitted by Baker were dated 1985 and, apparently, were written in support of his prior application to Bars other than ours. *E.g.,* Letter of Robert E. McCormack, III Esq., Atlanta GA, July 3, 1985 ("To Whom It May Concern: I have been practicing law in the State of Georgia since 1977. In my practice I have become acquainted with Robert Baker. I believe him to be a person of high moral character, keen intelligence, and great legal acumen."); Letter of Beryl B. Farris, Atlanta, GA, July 2, 1985 ("TO: Utah State Bar[.] RE: Robert Baker, bar applicant[.] Robert Baker has been an active member of the Georgia Bar and a member in good standing of the State Bar of Georgia since 1980. I am unaware of any acts or events which would impugn his good moral character or legal competency."). Other letters bore more current dates. *E.g.* Letter of Kenneth D. Webb, Esq., Atlanta, GA, June 11, 1987 ("TO WHOM IT MAY CONCERN: I am delighted to state that I am acquainted with Robert Baker. He previously maintained his office for the practice of law in the same suite of offices as mine."). Still other letters from leaders in his religious community familiar with his religious practices bore dates in 1988.

No. 88–223 (April 3, 1989). We also asked for a more particular explanation of the reasons for denying Baker's application. The Committee filed a Report of the Committee on Admissions on Remand ("Report on Remand"), in which it explained its construction of Rule 46(c)(3)(i), provided more particulars regarding its finding that Baker had failed to demonstrate good moral character, and again refused to certify his application, citing the moral character issue as its sole ground. In its Report on Remand and in its subsequent brief in this court, the Committee abandons any reliance on Baker's answer to the question on his application concerning his attempt to obtain admission in California.

## II

We begin with the fundamental premise stated in *In re Manville*, 494 A.2d 1289, 1292 (D.C.1985), that "[i]t is, ultimately, for this court to decide whether an applicant shall be admitted to the Bar of the District of Columbia." In reaching this decision, we give some measure of deference to the Committee's factual findings, and we will accept those findings, unless unsupported by substantial evidence. *Id.* at 1293 (citing *In re Heller*, 333 A.2d 401, 402 (D.C.) (per curiam), *cert. denied*, 423 U.S. 840, 96 S.Ct. 70, 46 L.Ed.2d 59 (1975)). However, we have not always afforded this type of deference to the Committee's factual findings. *See In re Watts*, 557 A.2d 601, 603 (D.C. 1989) (too little weight was given by the Committee to affidavits supplied on behalf of applicant). Our deference to the Committee's factual findings must be measured both by our ultimate responsibility to make the decision at hand and by the *ex parte* nature of the process by which the Committee makes its findings. *Manville, supra,* 494 A.2d at 1293. The Committee's interpretations of Rules are quite another matter, and we are under no obligation to defer to the Committee in that regard.

In the matter before us, we are called upon to consider the Committee's interpretation of Rule 46(c)(3)(i) and its legal conclusion that the applicant failed to demonstrate good moral character by reason of his evasiveness and lack of candor in responding to the Committee's inquiry into his application. We must afford deference to the Committee's factual findings that Baker's testimony was evasive and lacked candor.

## A

### (1)

Initially, the Committee refused to certify Baker's application based in part on its interpretation of D.C.App.R. 46(c)(3)(i) as requiring an applicant to demonstrate that he or she engaged in the active practice of law in another jurisdiction for the five years preceding his or her application. In its Report on Remand, the Committee again urges us to accept this reading, although stating the basis for its refusal to certify Baker's application to be his alleged failure to demonstrate good moral character as it pertains to the practice of law.[9] We conclude that the Committee's interpretation of the Rule is erroneous.

We begin with the plain language of the Rule. Rule 46(c)(3)(i) provides in relevant part:

(3) Admissions requirements. Any person may, upon proof of good moral character as it relates to the practice of law, be admitted to the Bar of this court without examination, provided that such person:

(i) Has been *an active member in good standing* of a Bar of a court of general jurisdiction in any state or territory of the United States for a period of five years immediately preceding the filing of the application.

D.C.App.R. 46(c) (1989) (emphasis added). No mention is made of the practice of law. Thus, in plain and simple terms, all that this provision required of Baker was active membership in good standing of the State Bar of Georgia. As the record shows, at the time of his application Baker met this requirement.

---

9. *See* Report on Remand at 3; Committee's Brief at 5.

■ The meaning of the Rule is clear from its language. However, were even greater clarity desired, the history of the rule provides it. Rule 46(c)(3)(i), as it is presently drafted, was adopted by this court on October 20, 1983 to replace a previous rule that expressly required an applicant such as Baker to have engaged in active practice for a period of five years, a provision which had caused considerable difficulty in implementation, to say the least.[10]

Despite the clarity of the Rule and its history, the Committee contends in its Report on Remand that by dropping the practice of law requirement from Rule 46 we did not mean to permit the admission of applicants "without regard for whether the applicant actually practiced law." We disagree; that is indeed what we meant. *See also United States v. Brown*, 422 A.2d 1281, 1284 (D.C.1980) ("[a] change in legislative language gives rise to the presumption that a change was intended in legislative result") (citation omitted).

(2)

■ The Committee further contends that admitting applicants who have not actively practiced law for five years may prove constitutionally infirm. According to this argument, a requirement that an applicant under Rule 46(c)(3)(i) be no more than

a dues-paying member of another bar would be arbitrary and, thus, not rationally related to "an applicant's fitness or capacity to practice law." *Schware v. Board of Bar Examiners*, 353 U.S. 232, 239, 77 S.Ct. 752, 756, 1 L.Ed.2d 796 (1957); *Manville, supra*, 494 A.2d at 1295. Since active membership in the Bar, without more, is no indication of fitness to practice law, the Committee contends, admission on that ground alone might be deemed discriminatory as against applicants seeking admission under Rule 46(c)(3)(ii)—the subsection of the Rule permitting graduates of ABA-approved law schools to be admitted upon passing another jurisdiction's bar examination, achieving a scaled score of 133 or more on the Multistate Bar Examination, and passing the Multistate Professional Responsibility Examination. We find the Committee's argument to be flawed.

We do not share the Committee's view that active membership in a bar means nothing more than paying dues. We take judicial notice of the fact that some thirty-five jurisdictions in the United States now require Mandatory Continuing Legal Education ("MCLE") for active bar members [11] and will suspend or revoke the right to practice of attorneys who fail to comply with this requirement. Georgia is one of them.[12] Further, in many jurisdictions ac-

10. The supplanted rule provided in relevant part:

(i) Members of a Bar of a court of general jurisdiction of any state or territory may, upon proof of general fitness to practice law and good moral character, be admitted to the Bar of this Court without examination *provided such member has engaged in the practice of law for a period of not less than 5 years of the 8 years immediately preceding the date of his or her application.*

(ii) In the event that the requirements for admission without examination of the state or territory upon which the application for admission is based provides for a *period of practice* of less than 5 years, the applicant may seek admission based upon the time period requirements of that jurisdiction.

D.C.App.R. 46(c) (1982) (emphasis added). This version of the Rule also included, as Rule 46(c)(3)(iv), a definition of "practice of law" which, after frequent amendment, came to comprise six paragraphs and six sub-paragraphs.

A comparable practice-of-law requirement had been in effect since September 28, 1973. *See* D.C.App.R. XII § 5 (1972).

11. *See* Comprehensive Guide to Bar Association Requirements 1989, at Chart XI (published by ABA & NCBE).

12. In its brief, the Committee notes that the record is silent as to whether Baker, in fact, met his MCLE obligations in Georgia during his five years of active membership. We respond by noting that the Committee was certainly free to inquire into such matters during its investigation of Baker's application. Baker certainly cannot be faulted for failing to answer questions never put to him. Nonetheless, among the letters Baker submitted in the Appendix to his Memorandum of Points and Authorities is one from Barney L. Brannen, Jr., Director of the Institute of Continuing Legal Education in Georgia and dated March 23, 1988. Brannen writes:

Mr. Baker attended the English Common Law Seminar in London, England, June 16–25, 1984. I became acquainted with him during

tive membership in the bar entails responsibilities such as court appointments, listing with lawyer referral services, and client-fund handling regulations. All of these activities and responsibilities are designed to ensure that active members of the bar are continually and meaningfully engaged in the legal profession.

As is true of "bright line" rules generally, the "active member in good standing" test contained in Rule 46(c)(3)(i) is not perfect. It may result in the admission of candidates whose qualifications are less than ideal. Likewise, it may exclude candidates whose qualifications are otherwise exemplary. As the Supreme Court has said:

> [i]f the classification has some "reasonable basis," it does not offend the Constitution simply because the classification "is not made with mathematical nicety or because in practice it results in some inequality." *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78 [31 S.Ct. 337, 340, 55 L.Ed. 369 (1911)]. "The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be and unscientific." *Metropolis Theatre Co. v. City of Chicago*, 228 U.S. 61, 69–70 [33 S.Ct. 441, 443, 57 L.Ed. 730 (1913)]. "A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." *McGowan v. Maryland*, 366 U.S. 420, 426 [81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961)].

*Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161–62, 25 L.Ed.2d 491 (1970); *accord Cruzan v. Director, Missouri Dep't of Health*, —— U.S. ——, ——, 110 S.Ct. 2841, 2854, 111 L.Ed.2d 224 (1990) ("But the Constitution does not require general rules to work faultlessly; no gen-

eral rule can."); *Roberts v. District of Columbia Bd. of Medicine*, 577 A.2d 319 (D.C.1990) ("although the Board's requirement of a 75 passing grade may seem harsh when the applicant came close to that and was certified by another state, it is the Board's duty to protect the general public from unqualified physicians and the requirement rationally serves that purpose").

Thus, perfection is not the constitutional yardstick for judging the application of a "bright line" bar admission rule. Rather, the test is whether the rule bears a "rational connection with [an] applicant's fitness or capacity to practice law." *Schware, supra*, 353 U.S. at 239, 77 S.Ct. at 756. Further, "in applying permissible standards, officers of a state cannot exclude an applicant when there is no basis for their finding that he fails to meet these standards, or when their action is invidiously discriminatory. *Cf. Yick Wo v. Hopkins*, 118 U.S. 356 [6 S.Ct. 1064, 30 L.Ed. 220 (1886)]." *Id.*

We amended Rule 46 in 1983 to avoid the myriad difficulties we experienced between 1973 and 1983 in administering an "active practice of law" requirement. See note 11, *supra*. We replaced that test with the present "bright line" rule. We are satisfied, and hold, that Rule 46(c)(3)(i)(3) meets the "rational connection" test of *Schware*.[13]

### B

We turn now to the Committee's finding that Baker failed to demonstrate good moral character and general fitness to practice law, which as we noted above has now become the Committee's sole ground for refusing to certify Baker's application.

---

this period of time while he was completing mandatory training for active members of the Georgia Bar. His Georgia Bar number is 033880 and he received his 1984 certification by participating in this program.

**13.** We note that a variety of bar rules that draw distinctions between classes of applicants have been upheld. *See, e.g., O'Neal v. Thompson*, 559 F.2d 485, 486 (9th Cir.1977) (upholding Neva-

da's rule granting admission to law professors, while requiring other attorneys to sit for an exam); *Ktsanes v. Underwood*, 467 F.Supp. 1002, 1007–08 (N.D.Ill.1979) (upholding rule prohibiting attorneys who have taken and failed the state bar exam from being admitted by motion); *Goetz v. Harrison*, 154 Mont. 274, 462 P.2d 891 (upholding rule automatically admitting graduates of University of Montana law school).

Rule 46(d) requires that the applicant must show good moral character and general fitness to practice law. As we said in *Manville*, "[t]his court has previously noted that the term 'good moral character' is 'of broad dimension and ... can be defined in many ways." [citations omitted.] Although the term escapes precise definition, it does, nevertheless, possess a core of meaning. As Justice Frankfurter stated:

> [A]ll the interests of man that are comprised under the constitutional guarantees given to "life, liberty and property" are in the professional keeping of lawyers.... From a profession charged with such responsibilities there must be exacted those qualities of truth-speaking, of a high sense of honor, or granite discretion, of the strictest observance of fiduciary responsibility, that have, throughout the centuries, been compendiously described as "moral character." [citing *Schware, supra*, 353 U.S. at 247, 77 S.Ct. at 760–61]

494 A.2d at 1297–98. We went on to add to this definition respect for the rights of others and for the law, trustworthiness, reliability, and commitment to judicial process and the administration of justice. *Id.* at 1298. Further, we stated that our purpose in requiring these character traits is to protect the public and assure the "ethical, orderly, and efficient administration of justice." *Id.*

■ Like other qualifications for admission, the requirement of good moral character is not standardless. For an omission or misrepresentation to be evidence of an applicant's lack of moral fitness, the omission or misrepresentation must be material. *See Carver v. Clephane*, 78 U.S.App.D.C. 91, 92, 137 F.2d 685, 686 (1943) (application of materiality test). Counsel for the Committee and advocacy amici for Baker both agree on this. They differ, however, on the test of materiality.

Amici argue that for misrepresentations to be material, they must in fact be false, citing *Florida Bd. of Bar Examiners v. Groot*, 365 So.2d 164, 168 (Fla.1978) (statement concerning student loan payments, taken in context, was true), and *Siegel v.*

*Committee of Bar Examiners*, 10 Cal.3d 156, 178–79, 110 Cal.Rptr. 15, 31, 514 P.2d 967, 983 (1973) (requirement is objective falsity). According to amici, such omissions or misrepresentations must also be of the magnitude to indicate a lack of good moral character, citing us to *In re Bowen*, 84 Nev. 681, 683–84, 447 P.2d 658, 659 (1968) as well as *In re Martin–Trigona*, 55 Ill.2d 301, 307, 302 N.E.2d 68, 71 (1973) (gross mischaracterization required), and *Greene v. Committee of Bar Examiners*, 4 Cal.3d 189, 197–98, 93 Cal.Rptr. 24, 30, 480 P.2d 976, 982 (1971). Finally, amici contend that an intent to deceive is required, citing us to *Application of Gimbel*, 271 Or. 671, 674, 533 P.2d 810, 811 (1975) (per curiam), *Siegel v. Committee of Bar Examiners, supra*, 110 Cal.Rptr. at 31, 514 P.2d at 983, and *Lopez v. Florida Bd. of Bar Examiners*, 231 So.2d 819, 821 (Fla.1969). Amici conclude by contending that since questions about "active practice" were irrelevant under Rule 46(c)(3)(i), neither the Committee's questions nor Baker's answers were "material" to his application, citing us to *Martin B. v. Committee of Bar Examiners*, 33 Cal.3d 717, 721–22, 190 Cal.Rptr. 610, 612–13, 661 P.2d 160, 162–63 (1983), and Annotation, *Falsehoods, Misrepresentations, Impersonations and Other Irresponsible Conduct as Bearing on Requisite Good Moral Character for Admission to Bar*, 30 A.L.R. 4th 1020, 1063–79 (1984).

On the other hand, the Committee contends that misrepresentations and lack of candor are material to the issue of good moral character, except perhaps when the subject of the questions is invidious or otherwise manifestly improper. The Committee analogizes to the exclusionary rule, citing *Mapp v. Ohio*, 367 U.S. 643, 659, 81 S.Ct. 1684, 1693–94, 6 L.Ed.2d 1081 (1961), and *Martin B. v. Committee of Bar Examiners, supra*, 190 Cal.Rptr. 610, 661 P.2d 160.

■ We need not dwell on the issue of materiality and intent to deceive, however, because we are satisfied that, even deferring to the credibility portion of the Committee's findings that Baker was lacking in candor and was evasive in certain of his

responses to questions and by refusing to provide copies of the Schedule C forms he filed between 1980 and 1985, as requested, Baker satisfied his burden of proving good moral character.

The Committee concluded on remand that Baker had evinced evasiveness and lack of candor in two respects: (1) his responses to the Committee's questions concerning the extent and nature of his practice in Georgia, and (2) his refusal to provide portions of his Georgia and federal tax returns to substantiate his claim that he performed most of his Georgia practice over the telephone.

We begin by noting that as part of his application, Baker produced six letters from attorneys and others who know him attesting to his good moral character. He has also submitted to us, as an Appendix to his Memorandum of Points and Authorities, three letters from clergy bearing similar attestations, as well as letters from prior applications to the bars of other states. Further, there is nothing in the record to indicate that Baker has a criminal record or that he has ever had his honesty or integrity called to account by any school, employer, state bar, or court. The Committee does not bring to our attention any incident from Baker's past tending to show evasiveness, lack of candor, or dishonesty on Baker's part. All of the evidence relied upon by the Committee stems from Baker's conduct in responding to the Committee during its investigation of his application. Further, we note that which Counsel for the Committee conceded at oral argument: Baker suffers from a significant speech impediment and testified at the hearing alone and without benefit of counsel.

The Committee contends that its inquiries into Baker's Georgia practice and his responses to those inquiries were material to Baker's application because the Committee pursued those inquiries in the good faith belief that Rule 46(c)(3)(i) required Baker to show five years of active practice. But even if we accept the Com-

mittee's view, the record does not support the Committee's conclusion that Baker demonstrated a lack of candor or evasiveness concerning these matters; to the contrary, the record demonstrates that Baker willingly and freely supplied the Committee with enough information to deny his application on the ground that he had not maintained an active practice in Georgia for five years.

During the formal hearing, Baker testified that in five years of practice in Georgia he had only three Georgia clients. Two of these clients were attorneys who had sought tax advice from Baker on behalf of their own clients. The third client was Baker's girl friend to whom Baker had given some advice on one occasion regarding the preparation of her 1982 tax return. Barring the most unusually complicated and time-consuming tax problems, it is highly unlikely that serving three clients in a five-year period would constitute the "active practice of law." [14]

Thus, without going any further than this, the Committee had all it needed to deny Baker's application on the "active practice" ground. In light of the damning "active practice" evidence that Baker freely and willingly supplied to the Committee, the fact that he refused or failed to supply anything extra loses much of its force.

Specifically, the Committee points to Baker's inability to recall the name of his landlord, the present married name of the woman with whom he had lived in Atlanta during the years in question—his then-girl friend—and the location within Atlanta of the street where he lived. The Committee also points to Baker's refusal to provide copies of the Schedule C forms he said he had filed as part of his state and federal income tax returns during the years 1980 through 1985.

Momentary lapses of memory during an examination by five questioners do not a reasonable basis for a finding of evasiveness make. Surely, one may forget a detail like the name of one's landlord, particu-

---

**14.** Likewise, the record is clear that Baker spent little of his time in Georgia. *See e.g.,* n. 15, *infra* (B.B.F. letter). Thus, the tax returns re

telephone expenses would not add significantly in this regard.

larly when the landlord is a management company, without casting doubt on one's overall credibility. Besides, Baker had provided the name of his landlord to the Committee prior to the hearing as part of his application.[15] As to the present married name of a former girl friend, there are eminently good reasons for letting what may be an uncomfortable fact slip one's mind that have nothing at all to do with credibility.[16]

As to Baker's alleged evasiveness regarding the location of the street where he lived, the transcript speaks for itself:

Q. And where is Buford Highway located?

A. It is—well, it's—it isn't in the main—well, it's in the main town—

Q. What main town?

A. Oh, it's in the main town of Atlanta, except it is not actually in the main—well, I can't think of how to explain it. It is not—it's a little bit on the outskirts but it[']s not on the outskirts.

This passage reveals, basically, the difficulty of describing the location of a street within a city to someone unfamiliar with that city. One may station oneself anywhere on the Mall in Washington and likely hear similar conversations between tourists looking for Georgetown and "natives" on their way to and from work, even when those "natives" do not have Baker's speech impediment and his tendency to digress.

Finally, there is the tax information requested by the Committee. In view of the evidence already provided by Baker during the formal hearing concerning his "active practice" in Georgia, the tax information requested by the Committee was in essence redundant. We are satisfied that the tax information would not have been necessary to showing that Baker failed to satisfy a five year active practice requirement.[17]

## III

For the foregoing reasons, we conclude that Robert Baker has satisfied the requirements for admission under D.C. App.R. 46(c)(3)(i) and order that he be admitted to the Bar of the District of Columbia Court of Appeals upon taking the oath as prescribed by D.C.App.R. 46(h).

*It is so ordered.*

FERREN, Associate Judge, concurring:

As I understand the opinion for the court, we first conclude—contrary to the opinion of the Committee on Admissions—that D.C.App.R. 46(c)(3)(i) no longer requires an applicant for admission to our bar without examination to demonstrate that he or she has been engaged in the active practice of law in another jurisdiction for the five years immediately preceding the application. The applicant has to show only that he or she has been "an active member in good standing" of the bar of another jurisdiction for that five year period, without regard to how much legal practice the applicant has actually conducted in that state. We also conclude that our rule, as thus interpreted, is not constitutionally infirm.

Next, we assume for the sake of argument that the Committee's inquiry into the extent of Baker's practice of law in Geor-

---

15. As Baker's application form shows, in answer to Question 39 he provided the name of his landlord, Law Offices Limited, as well as the name of three employees of the firm. As part of its routine investigation into Bar applicants, the National Conference of Bar Examiners was able to contact Baker's landlord and obtain two letters from them providing information on his conduct as a tenant. Furthermore, one of Baker's references, B.B.F., an attorney in the building where he maintained his "profile" office, provided the Committee with information adverse to Baker's "active practice" claim; namely, a letter indicating that she believed his "primary practice was in California where he actually resided." (*See* October 10, 1986 letter of B.B.F.

to the Committee.) Thus, it cannot seriously be maintained that Baker was trying to keep anything from the Committee by failing to recall information he had already provided.

16. Baker did give the woman's maiden name.

17. We further note that, after reflection, Baker purported to give a good faith version—"religious convictions"—for not supplying the tax information he originally agreed to provide. We need not decide whether this refusal was justified on this basis because we do not think the information would have made any difference.

gia—which was material to his admission here under the Committee's good faith understanding of the rule—was also material to the issue of Baker's "good moral character" under Rule 46(d), even though we hold that the Committee's inquiry itself was legally irrelevant under Rule 46(c)(3)(i).

Finally, although we defer to the Committee's findings that Baker lacked candor and was evasive as to certain questions and tax returns germane to understanding his practice of law in Georgia, we conclude as a matter of law that Baker satisfied his burden of proving good moral character because he was honest and forthright enough for the Committee to find rather easily that he had not actively practiced law for five years in Georgia (and because there was no other negative information). In other words, Baker's waffling on part of the inquiry was legally insignificant when compared to his candid admissions that made clear he could not meet an active practice requirement.

I write separately for two reasons. First, I would hold, not merely assume for argument's sake, that the Committee's good faith inquiry into the extent of Baker's Georgia practice was material to the issue of his good moral character even though, as it turned out, the extent of Baker's Georgia practice was legally irrelevant to his admission to the District of Columbia bar under Rule 46(c)(3)(i). The Committee's interpretation of the rule, based in part on constitutional concerns, was not frivolous or ill-intentioned. Under such circumstances, I believe we should not leave any room for doubt: an applicant's lack of candor or evasiveness cannot be excused merely because a question by the Committee on Admissions, asked in good faith without objection, turns out to be legally irrelevant. The situation would be different, of course, if an applicant objected and refused to answer a question because of an expressly stated intent to test the legality of a particular admissions requirement.

Second, because we must accept Committee fact-finding supported by the record and must afford the Committee's recommendation "some deference," *In re Manville*, 494 A.2d 1289, 1293 (D.C.1985), I am troubled about overriding the Committee's conclusion that Baker lacked candor and was evasive to the point that he failed to carry his burden to prove good moral character. The Committee observed Baker in person on at least two occasions; our perception is limited to a written transcript. Furthermore, there was no dissenting vote in the Committee's recommendation to deny Baker admission to our bar. Nonetheless, having read the transcript of Baker's formal hearing several times, I am prepared to vote for his admission. His rambling, confusing responses do not suggest to me lapses of character as much as they reflect a sheer inability to communicate. I am satisfied that on this record we would be acting arbitrarily if we were to deny Baker admission—a decision that "remains for this court," not the committee, "to make." *Id.*